HENRY M. RODNEY AND LUCILLE H. RODNEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2788–64, 102–68.    Filed November 25, 1969.

*Myron E. Anderson*, for the petitioners.
*Gary C. Randall*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income taxes and additions to taxes under section 6653(b), I.R.C. 1954,[1] for the years and in the amounts as follows:

---
[1] All references are to the Internal Revenue Code of 1954.

| Docket No. | Year | Deficiency | Additions to tax under sec. 6653(b) |
|---|---|---|---|
| 2788–64 | 1960 | $9, 628. 81 | $4, 814. 41 |
| | 1957 | 1, 492. 82 | 746. 41 |
| | 1958 | 2, 612. 44 | 1, 306. 22 |
| 102–68 | 1959 | 6, 181. 18 | 3, 090. 59 |
| | 1961 | 4, 964. 19 | 2, 482. 10 |
| | 1962 | 3, 273. 66 | 1, 636. 83 |
| | 1963 | 1, 620. 98 | 810. 49 |

The parties have disposed of a number of the issues raised by the pleadings, leaving the following for our consideration:

(1) Whether assessment of deficiencies against both or either of petitioners for the years 1957 through 1959 and 1961 through 1963 is barred by the statute of limitations. For all of these years except 1963 the determination of this issue is dependent upon whether the returns filed by petitioners were false and fraudulent with intent to evade tax.

(2) Whether any part of the underpayment, if any, of tax by peti-tioners for each of the years 1957 through 1962 is due to fraud.

(3) Whether petitioner Henry M. Rodney is estopped to deny fraud for the years 1959 through 1962 because of his conviction under section 7201 of willful attempt to evade income tax for each of those years.

(4) Whether petitioner Lucille H. Rodney is estopped to deny fraud for each of the years 1959 through 1962, because of her husband's conviction of willful attempt to evade income tax for each of those years, and if she is not so estopped does respondent have the burden to prove fraud for each of those years in order to sustain his deter-mination of fraud against Lucille H. Rodney.

(5) What is the proper amount of petitioners' income from inter-est, sale of a piece of real property, rental received, and unexplained bank deposits for the years here in issue?

(6) Whether petitioners are entitled to deduct certain insurance premiums as business expenses and to deduct depreciation and other business expenses in an amount in excess of the amount of such ex-penses as computed by respondent for the years here in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Henry M. Rodney and Lucille H. Rodney, husband and wife, whose residence at the time the petitions in these cases were filed was Spokane, Wash., filed their joint Federal income tax returns for each of the calendar years 1957 through 1963 with the district director of internal revenue for the district of Washington. The returns for the years 1957 through 1962 were filed on or about April 15, 1958

through 1963, respectively. The petitioners' return for the calendar year 1963 was filed on May 7, 1964. On March 1, 1967, petitioners signed a waiver extending the time for assessment of tax for the year 1963 to December 31, 1967. This waiver was accepted by respondent on March 20, 1969. Petitioners kept their books and records and filed their income tax returns on a cash receipts and disbursements basis, except that on certain interest and sales items they elected to use and did use other methods of accounting.

Petitioners' income tax returns for the years in issue were prepared by Melvin Workman (hereinafter referred to as Workman). Workman had 5 years of college training, 3 years work with a C.P.A., and 2 years experience in private accounting. Although he was not a C.P.A. he held himself out as a competent accountant experienced in the preparation of Federal income tax returns. Petitioners furnished Workman with all information requested by him, including for 1957 and 1958 information relating to income from the rental of space in buildings which Henry M. Rodney had constructed and the expense incurred in producing such rental income.

Henry M. Rodney (hereinafter referred to as petitioner) is a medical doctor who received his M.D. degree from Cornell University in 1945. Upon receipt of his medical degree he was drafted into the armed services. In 1946 he was discharged from the Armed Forces and began to practice as a physician in partnership with his mother, Mary Rodney, who is also an M.D. Petitioner continued in practice with his mother until 1953 when he was again called to active duty in the military service. Petitioner was discharged from the Army in 1955 and resumed his practice in association but not in partnership with his mother.

At the time of his return from military service in 1955 he had a substantial sum of money in cash which he had carried with him generally throughout his tour of military duty. When he was stationed at Ft. Sam Houston he had from time to time lent some of the cash to other medical doctors. Petitioner felt he needed a cash reserve against the unforeseen events which might arise while he was in the military service. During his tour of duty in the Army he had his wife and five children with him and desired some assurance of their security.

Shortly after returning from the military service petitioner decided to purchase property and build a building suitable for a medical clinic. In late 1955 or early 1956 he located a site which he considered appropriate for such a building and expended funds for preliminary steps in connection with erecting buildings thereon such as architect's sketches, cost estimates, and property options. The necessary zoning changes required to permit use of the piece of property petitioner had

selected for a medical clinic were denied by the planning commission. Petitioner let his option lapse and lost the option payments. During 1956 petitioner expended approximately $5,600 in connection with plans to acquire the site which he did not acquire. Later in 1956 petitioner acquired a suitable piece of land for a medical clinic outside the jurisdiction of the planning commission for a purchase price of $8,500. He then purchased some building shells which he had moved on to the land and began the construction of his clinic buildings. Petitioner borrowed $44,000 from the Great Northwestern Life Insurance Co., $21,000 from his mother Mary Rodney and used $20,000 which he had in a bank account in Spokane in the construction of his medical clinic buildings. In addition petitioner used some of the remaining portion of the money which he had with him when he returned from his military service in the construction of the clinic building. During the time petitioner had the clinic buildings under construction he was engaged in the practice of medicine and was generating income through his practice. He used some of his current income in the construction of the clinic buildings. When petitioner told Workman about his buildings he also told him that he planned to incorporate a business to own and handle the rentals of the buildings. For this reason Workman did not include any income or expenses of the rental operation of the buildings on petitioner's Federal income tax returns for 1957 and 1958 although he knew that use of the buildings had begun in 1957. He did compute a basis to petitioner of the buildings of $174,802, which was used on petitioner's return for 1959 and later years in computing depreciation. Workman was furnished with no receipts or other records of cost by petitioner, but computed the basis of the buildings from his knowledge of the funds available to petitioner for construction of the buildings and what he considered a reasonable cost for the floorspace included in the buildings. Workman determined the useful life of the buildings to be 30 years without consulting with petitioner. The stipulated useful life of the buildings is 20 years. Petitioner first began using the buildings and receiving rental income during 1957 but claimed no depreciation thereon until 1959 when he first reported the rental income from the buildings and claimed deductions with respect to the rental business. On petitioner's 1959 tax return, prepared for him by Workman, depreciation for the clinic buildings is claimed on a straight-line basis. Petitioner claimed depreciation on the buildings in the same manner for each of the taxable years 1959 through 1963.

Great Northwestern Life Insurance Co. made a mortgage loan to petitioner for completion of construction of the clinic buildings. Before

this company would loan the necessary funds, it required petitioner to insure his life in an amount sufficient to substantially pay off the mortgage. Petitioner obtained a term life insurance policy for the duration of the loan, with the proceeds to be used to pay off the mortgage in case of his death.

Petitioner's clinic contained extensive medical equipment and specialized items relating to the practice of surgical medicine. Each room in the clinic contained air, oxygen and suction units, special wiring, and remote control outlets. There was special flooring in the two surgeries, a special collection system for plaster in the orthopedic department, special nonglare lights in the surgeries, X-ray boxes in each room, four outlets in the surgeries in order to avoid wiring and cable entanglements, a radio-active-protection area, a heating and humidifying system, and a distillation apparatus. There were leaded windows, split cedar shakes, and specially designed terrazzo floor panels in the clinic buildings. In addition to these special items the buildings contained the ordinary plumbing installed in office buildings.

The clinic building was two-floored in the shape of an H, with each leg being 35 feet by 55 feet and the connecting wing being 40 feet by 30 feet. The rental building was 90 feet by 30 feet with a basement. During the course of construction the buildings were appraised at the direction of the lender in order to determine the advisability of additional financing. The buildings were appraised at an average cost of $10 per square foot based on the then completed 8,000 square feet.

In 1952 petitioners purchased a duplex jointly with William J. Robinson and his wife. Robinson handled the purchase and details of rental as well as the subsequent sale of this property. All of petitioners' information regarding the purchase price of the duplex came from Robinson, who also kept the records relating to the property. In 1957 petitioners and the Robinsons sold the duplex to Edsel G. Maggard and his wife for a total consideration of $15,000. The Maggards paid $5,316.13 in cash, assumed a mortgage of $6,632.92, and assigned to the sellers a contract on another property in the face amount of $3,389.94. The contract was given an agreed value by the parties to the sale of $3,050.95 in closing the sale transaction.

During part of 1957, all of 1958, and part of 1959 petitioners received regular payments on the contract which they had taken as part payment for the duplex. In 1959 petitioners and the Robinsons sold the contract at a 10-percent discount from its then remaining face amount.

In 1958 petitioners entered into an agreement with Peter Charles Lilly for the leasing of space to be used as a dental office. Under the agreement petitioners were to remodel the office space in accordance

with the plans furnished by the lessee and amortize the expenses over the 2-year term of the lease. When Lilly failed his dental licensing exams, a contingency clause in the lease operated to relieve him of its obligations. Petitioners thereafter entered into a lease agreement with a dentist named Mellon for the same office space. The Mellon lease was for 36 months, whereas the Lilly lease was for 24 months. The stipulated rental under the Mellon lease was $150 per month for a total of $5,400, whereas the rental payment under the Lilly lease was set at $75 per month for a total of $1,800. The difference in rental arose from a clause in the Lilly lease requiring Lilly to pay the amortized cost of the remodeling on a prorated monthly basis in addition to the base rental. The Mellon lease did not contain such a clause. Mary Rodney advanced $2,175 in 1958 for remodeling the dental office in one of petitioners' buildings. This sum was repaid in 1959, 1960, and 1961 from the rental receipts from Mellon.

Petitioner was the house physician for the Sillman Hotel in Spokane. Some individual attempted to interfere with petitioner's removing a patient from the hotel during the course of a party. An altercation ensued. In full settlement of all potential claims arising out of the altercation and for legal services incident to the settlement, petitioner in 1961 paid $350 to an attorney. He deducted this payment on his 1961 Federal income tax return.

In 1960 the basement of the clinic building became flooded as a result of an unknown drainage problem, and was damaged by a combination of the flooding and freezing weather necessitating major repairs.

In October of 1959 petitioners sold certain specifically described personal property relating to the operation of the drugstore in one of their buildings to Curtis F. Peterson under a conditional sales contract. The sale price of the property was $12,743 and payment was to be in monthly installments of $189.23. In lieu of a down payment petitioners accepted a promissory note in the amount of $3,000 to be held as security. The note was to be paid by part of the monthly sums payable under the contract and was to become immediately payable in full upon default by Peterson in any monthly payment. By the terms of the conditional sales contract Peterson was to pay 6½-percent interest on monthly deferred payments and the monthly payments were to include interest payments.

Also in October of 1959 petitioners advanced Peterson the amount of $9,500 receiving in return a note in that amount payable at 6½-percent interest in monthly installments of $95.19, including interest. In February of 1960 petitioners made an additional loan to Peterson of $2,000 taking back a note in that amount payable in monthly installments of $95.19, including 6½-percent interest, the installment payments to begin after the note of October 1959 had been paid off.

The payments under the conditional sales contract were collected by the Spokane and Eastern Branch of the Seattle First National Bank, collecting agent, through escrow account No. 15194. Payments when received were allocated by the bank between principal and interest. The notes of October 1959 and February 1960 were collected by the Spokane and Eastern branch of the Seattle First National Bank, collection agent, through account No. 707, which was closed out in 1961 and thereafter the notes were collected through account No. 31835 of the Old National Bank of Spokane. In each instance the collecting agent allocated each payment when received between principal and interest.

Petitioner was told by his accountant that he should defer allocating any of the payments to interest income until the full amounts of the obligations had been repaid because of the high-risk nature of the transactions.

In June of 1961 petitioner requested his cousin, James M. Piper, an officer in Northwest Service, Inc., a truck-leasing firm to purchase a Chevrolet through the firm for petitioner's use. Petitioner in 1961 paid $1,478.52 which was the amount of the purchase price of the car. The application for registration shows petitioner as owner and the leasing company as the holder of the mortgage and shows payment to be by way of lease. Under the space on the application for signature of "mortgagee or registered owner" appears the name of the leasing company by petitioner. Piper considered the transaction to be a purchase through his company of an automobile for a relative at a very low price. The leasing company retained no business records of the transaction. Petitioner's accountant, with full knowledge of the transaction, prepared petitioner's Federal tax return on the basis of deducting the amount paid by petitioner in 1961 as a rental payment on a business automobile. Petitioner had read articles making the statement that the expense of leasing a business automobile could be deducted for income tax purposes.

During the year 1963 petitioner owned a boat carrying the name *Bon Selene* and the identification number 212 614. The vessel weighed less than 20 tons and was licensed in 1964 to troll for salmon on Puget Sound for that year.

Petitioner was a member of the Medical Service Corp., a hospital and medical insurance plan in the Spokane area. At the end of each year petitioner would be paid by Medical Service Corp. the amounts due him for services to patients who were covered by the Medical Service Corp. insurance plan with the exception of 25 percent which would be withheld by Medical Service Corp. as a reserve against defaulting patients. At the end of the year following the year of treatment the 25 percent which had been withheld would be paid to peti-

tioner. The checks representing this 25 percent were not included as receipts in petitioner's daybook and did not pass through the Rodney and Rodney checking accounts into which all other patients' fees were deposited. The full fee charged the patient during the course of the initial visit was charged to the patient on petitioner's records and appeared on the daybook record. The amount paid currently to petitioner by Medical Service Corp. was also shown in the daybook. During his practice prior to his reentrance into the service in 1953, petitioner had reported his income on an accrual basis and had encountered difficulties with internal revenue agents because the Medical Service Corp. payments of amounts withheld the previous year showed up twice in his accounting procedures, once as patient charges and again as receipts of Medical Service checks. Petitioner excluded his delayed receipt of the Medical Service checks with the intention to avoid confusion in his bookkeeping and double taxation on the sums received.

Petitioners had a number of checking accounts during the years here in issue. The following is a list of petitioner's accounts, together with the name in which each account was held during the years in issue:

| Bank | Account and date opened | Authorized signature | Principal purpose |
|---|---|---|---|
| Old National Bank. | Rodney & Rodney 1/31/56. | Dr. Henry Rodney. | Medical profession receipts and expenses. |
| Washington Trust Bank. | Research and Development 8/25/52. | R. E. Ellis_____ | Bldg. and Maintenance of rental property. |
| Old National Bank. | Capt. Henry M. and Lucille Rodney 7/28/49. | Henry or Lucille Rodney. | Personal. |
| Washington Trust Bank. | Henry M. Rodney_ | Henry M. Rodney_ | Personal. |
| Old National Bank. | Henry M. Rodney, M.D., medical clinic 1/15/57. | Henry M. Rodney_ | Operation of medical clinic and construction. |
| Old National Bank. | Lucille H. Rodney 3/9/57. | Lucille H. Rodney_ | Personal. |
| Spokane Eastern__ | NW. Research and Development 4/22/57. | R. E. Ellis_____ | Operation of rental property. |
| Spokane National__ | Advatract 9/14/59_ | Daniel L. Wilson__ | Sign acquisition rental and expenses. |
| First National_____ | General Realty and Insurance 6/10/60. | Charles Morell____ | Miscellaneous business account. |
| Citizens Savings & Loan Society of Spokane. | Diana Rodney, Education No. 15071 March 1962. | Henry M. and Lucille H. Rodney. | Education of Diana Rodney. |

Unnamed Canadian account on which interest of $.05 was credited in 1961.

The signatures for all of these accounts were in petitioner's handwriting except for the Northwestern Research and Development account in which the signature "R. E. Ellis" appeared in a different handwriting from the petitioner's normal hand. Each of these accounts was used to segregate funds designated for specific purposes, and enable petitioner to compartmentalize his expenses and income. Also, the fictitious names enable petitioner to avoid any increased pricing which might have resulted from use of his own name when purchasing materials utilized in the building and operation of the clinic and rental buildings. The name "R. E. Ellis" was registered by petitioner as a fictitious name with the county clerk's office in Spokane.

In February of 1962 petitioners opened savings account No. 15071 with the Citizens Saving & Loan Society of Spokane, Wash., for the purpose of providing for the education of their daughter, Diana Rodney. The account cards carried signatures of Henry M. Rodney and Lucille H. Rodney, and withdrawals and deposits were made to the account.

Petitioner's daybook contains the records, including the total fees charged, of all of petitioner's patients in each of the years here in issue. All of the records concerning petitioner's income-producing activities were either in the custody of petitioner himself or in the custody of Reynolds who was associated with petitioner in the operation and sale of the duplex. Petitioner furnished these records to respondent's agents during the course of their investigation of his income tax liabilities for the years here in issue.

Early in 1964 after respondent's agents had commenced their investigation of petitioner's income tax liabilities for the years here in issue, petitioner engaged James Delehanty, a C.P.A., to review his Federal income tax returns and the records on which they were based. Petitioner furnished Delehanty with checkbooks, canceled checks, deposit books, bank statements, medical daybooks, and some receipts. The Medical Service Corp.'s statements which petitioner had received were stapled into the daybook, and all canceled checks were taped back on to the check stubs in petitioner's checkbook. Delehanty was able to reconcile the daybook with petitioner's bank statements. The records maintained by petitioner were sufficiently clear to enable Delehanty to audit petitioner's transactions from 1956 through 1963.

The following charts show for the years here in issue petitioner's income as reported on his returns and as adjusted by Delehanty, as well as petitioner's claimed deductions and expenses, the adjustments as determined by respondent in his notice of deficiency, and the stipulated adjustments:

**1957**

| | Per petitioners' return | Petitioners' revised computation | Respondent's statutory notice | Respondent's revised computation | Stipulation | Stipulation increase from return | Stipulation decrease from return | Increase at issue | Decrease at issue |
|---|---|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | | | |
| Professional receipts | $30,195.54 | $30,680.12 | $32,316.46 | $30,680.12 | $30,680.12 | $484.58 | | | |
| Building rental receipts | | 3,455.97 | 4,356.13 | 3,455.97 | 3,455.97 | 3,455.97 | | | |
| Interest income | 94.61 | 111.91 | 118.58 | 118.58 | | 17.30 | | $6.67 | |
| Miscellaneous income | | 1.18 | | 1.18 | 1.18 | 1.18 | | | |
| Gain on sale of duplex | 1,261.13 | 857.47 | 1,261.13 | 1,139.60 | | | ($121.63) | | $282.13 |
| *Expenses* | | | | | | | | | |
| Medical practice expenses | (18,759.50) | (13,693.03) | (18,759.50) | (13,193.03) | | 5,066.47 | | 500.00 | |
| Rental business expenses | | (5,553.81) | | (5,272.35) | | | 5,272.35 | | 280.96 |
| Home use for business | | (600.00) | | (300.00) | | | 300.00 | | 300.00 |
| *Depreciation* | | | | | | | | | |
| Medical equipment | (3,240.81) | (1,752.03) | (3,026.27) | (1,752.03) | (1,752.03) | 1,488.79 | | | |
| Rental building and clinic | | (7,069.81) | | (2,322.62) | | | 2,322.62 | | 4,737.19 |
| *Loss* | | | | | | | | | |
| Rental loss on duplex | (125.67) | (125.67) | (125.67) | (125.67) | (125.67) | | | | |
| Standard deduction | (942.53) | (631.28) | (1,000.00) | (1,000.00) | (1,000.00) | | 67.47 | | |
| Exemptions | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | | | | |
| Totals | | | | | | 10,514.29 | 7,840.91 | 506.67 | 5,600.28 |

## 1958

| | Per Petitioners' return | Petitioners' revised computation | Respondent's statutory notice | Respondent's revised computation | Stipulation | Stipulation increase from return | Stipulation decrease from return | Increase at issue | Decrease at issue |
|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | |
| Professional receipts | $39,559.51 | $40,985.56 | $42,374.86 | $40,985.56 | $40,985.56 | $1,426.05 | ------ | ------ | ------ |
| Building rental receipts | | 6,378.61 | 6,607.36 | 6,378.61 | 6,378.61 | 6,378.61 | ------ | ------ | ------ |
| Interest income | 61.45 | 249.07 | 269.87 | 269.87 | 249.07 | 187.62 | ------ | $20.80 | ------ |
| Miscellaneous income | | .30 | .30 | .30 | .30 | .30 | ------ | ------ | ------ |
| Insurance recovery | | 1,200.00 | | 1,200.00 | 1,200.00 | 1,200.00 | ------ | ------ | ------ |
| **Expenses** | | | | | | | | | |
| Medical practice expenses | (24,322.48) | (15,357.26) | (24,322.48) | (14,857.26) | | 8,965.22 | | 500.00 | $420.24 |
| Rental business expenses | (11,883.59) | (11,883.59) | | (11,413.35) | | | ¹11,413.35 | | |
| Home use for business | (600.00) | (600.00) | | (300.00) | | | 300.00 | | 300.00 |
| **Depreciation** | | | | | | | | | |
| Medical equipment | (3,240.81) | (1,801.41) | (3,702.30) | (1,801.41) | (1,801.41) | 1,439.40 | | | |
| Rental buildings and clinic | | (9,210.34) | | (3,355.62) | | | ¹3,355.62 | | 5,854.72 |
| Dental office improvements | | | | (217.50) | | | | | 217.50 |
| Gain on sale of property | | 649.30 | | 649.30 | 649.30 | 649.30 | | | |
| Standard deduction | (1,000.00) | (1,000.00) | (1,000.00) | (1,000.00) | (1,000.00) | | | | |
| Exemptions | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | | | | |
| Totals | | | | | | 20,246.50 | 15,068.97 | 520.80 | 6,792.46 |

¹ These items are in fact a concession by respondent and not a stipulated figure. They are used here only to explain the amounts still in issue without using a separate column.

1959

| | Per petitioners' return | Petitioners' revised computation | Respondent's statutory notice | Respondent's revised computation | Stipulation | Stipulation increase from return | Stipulation decrease from return | Increase at issue | Decrease at issue |
|---|---|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | | | |
| Professional receipts | $41,642.57 | $43,546.16 | $43,517.91 | $43,546.16 | $43,546.16 | $1,903.59 | | | |
| Building rental | 2,490.00 | 6,135.13 | 6,282.75 | 6,135.13 | 6,135.13 | 3,645.13 | | | |
| Sign rental (net) | | (50.56) | 116.00 | (50.56) | (50.56) | | $50.56 | | |
| Rent allegedly paid to Henry M. Rodney | | (975.00) | | | | | | | $975.00 |
| Interest income | 63.53 | 182.25 | 346.15 | 346.15 | | 118.72 | | $163.90 | |
| Gain on sale | | | 9,078.92 | | | | | | |
| Discount on sale of contract | | (157.77) | | | | | | | 157.77 |
| *Expenses* | | | | | | | | | |
| Medical practice | (27,822.95) | (15,699.84) | (27,618.59) | (15,199.84) | | 12,123.11 | | 500.00 | |
| Rental business | | (15,330.54) | | (14,851.10) | | | ¹14,851.10 | | 479.44 |
| Home use for business | | (600.00) | | (300.00) | | | 300.00 | | 300.00 |
| *Depreciation* | | | | | | | | | |
| Medical equipment | (8,612.42) | (1,813.91) | (3,799.61) | (1,813.91) | (1,813.91) | 6,798.51 | | | |
| Rental buildings and clinic | | (8,289.31) | | (3,355.62) | | | ¹3,355.62 | | 4,933.69 |
| Dental office improvements | | | | (435.00) | | | | | 435.00 |
| Standard deduction | (876.07) | (694.66) | (1,000.00) | (1,000.00) | | 181.41 | | 305.34 | |
| Exemptions | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | | | | |
| Totals | | | | | | 24,770.47 | 18,557.28 | 969.24 | 7,280.90 |

¹ These items are in fact a concession by respondent and not a stipulated figure. They are used here only to explain the amount still in issue without using a separate column.

1960

| | Per Petitioners' return | Petitioners' revised computation | Respondent's statutory notice | Respondent's revised computation | Stipulation | Stipulation increase from return | Stipulation decrease from return | Increase at issue | Decrease at issue |
|---|---|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | | | |
| Professional receipts | $44,835.79 | $47,738.44 | $55,097.16 | $48,092.73 | ---- | $2,902.65 | ---- | ---- | ---- |
| Building rental | 5,978.72 | 8,455.84 | 10,039.84 | 8,455.84 | $8,455.84 | 2,477.12 | ---- | $354.29 | ---- |
| Rent allegedly paid to Henry M. Rodney | ---- | (900.00) | ---- | ---- | ---- | ---- | ---- | ---- | $900.00 |
| Sign rental (net) | ---- | (42.19) | ---- | (42.19) | (42.19) | ---- | $42.19 | ---- | ---- |
| Interest income | 124.85 | 124.85 | 1,888.49 | 1,537.81 | ---- | ---- | ---- | 1,412.96 | ---- |
| *Expenses* | | | | | | | | | |
| Medical practice expenses | (31,798.48) | (17,223.49) | (25,976.68) | (16,723.49) | ---- | 17,223.49 | ---- | 500.00 | 8,040.48 |
| Rental business expenses | ---- | (20,567.79) | ---- | (12,527.31) | ---- | ---- | [1]12,527.31 | ---- | ---- |
| Home use for business | ---- | (600.00) | ---- | (300.00) | ---- | ---- | 300.00 | ---- | 300.00 |
| *Depreciation* | | | | | | | | | |
| Medical equipment | (8,398.30) | (1,579.41) | (4,641.15) | (1,579.41) | (1,579.41) | 6,813.89 | ---- | ---- | 4,189.26 |
| Rental buildings and clinic | ---- | (7,629.36) | ---- | (3,440.10) | ---- | ---- | [1]3,440.10 | ---- | 435.00 |
| Dental office improvements | ---- | ---- | ---- | (435.00) | ---- | ---- | ---- | ---- | 435.00 |
| 1960 building costs | ---- | ---- | ---- | (887.59) | ---- | ---- | ---- | ---- | 887.59 |
| Standard deduction | (1,000.00) | (752.90) | (1,000.00) | (1,000.00) | (1,000.00) | ---- | ---- | ---- | ---- |
| Exemptions | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | ---- | ---- | ---- | ---- |
| Totals | | | | | | 29,417.15 | 16,309.60 | 2,267.25 | 14,752.33 |

[1] These items are in fact a concession by respondent and not a stipulated figure. They are used here only to explain the amount still in issue without using a separate column.

## 1961

| | Per Petitioners' return | Petitioners' revised computation | Respondent's statutory notice | Respondent's revised computation | Stipulation | Stipulation increase from return | Stipulation decrease from return | Increase at issue | Decrease at issue |
|---|---|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | | | |
| Professional receipts | $41,230.26 | $44,543.65 | $44,740.15 | $44,661.65 | | $3,313.39 | | $120.00 | |
| Rental receipts | 6,325.00 | 8,319.75 | 9,299.76 | 8,319.75 | $8,319.75 | 1,994.75 | | | |
| Rent allegedly paid to Henry M. Rodney | | (300.00) | | | | | | | $300.00 |
| Interest income | 183.91 | 183.40 | 1,540.10 | 1,540.10 | | | | 1,356.19 | |
| Casualty loss | | (766.40) | | (766.40) | (766.40) | | $766.40 | | .51 |
| *Expenses* | | | | | | | | | |
| Medical practice expenses [1] | (31,608.43) | (21,026.87) | (26,130.08) | (18,698.35) | | 10,581.56 | | 2,328.52 | |
| Rental business expenses | | (12,972.99) | | (12,472.11) | | | 12,472.11 | | 500.88 |
| Home use for business | | (600.00) | | (300.00) | | | 300.00 | | 300.00 |
| *Depreciation* | | | | | | | | | |
| Medical equipment | (8,093.20) | (1,226.41) | (4,121.18) | (1,226.41) | (1,226.41) | 6,866.79 | | | 3,299.72 |
| Rental buildings and clinic | | (6,866.42) | | (3,566.70) | | | 3,566.70 | | |
| Dental office improvements | | | | (435.00) | | | | | 435.00 |
| 1960 building costs | | | | (887.59) | | | | | 887.59 |
| Car depreciation | | | | (215.60) | | | | | 215.60 |
| Standard deduction | (803.74) | (915.51) | (1,000.00) | (1,000.00) | | | | 84.49 | |
| Exemptions | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | | | | |
| Totals | | | | | | 22,756.49 | 17,105.21 | 3,889.20 | 5,939.30 |

1 Petitioners' computation with regard to this item seems to include the $350 attorney's fees at issue in the year, arising out of an altercation in the course of Henry M. Rodney's removal of a patient from the Silliman Hotel.

1962

| | Per petitioners' return | Petitioners' revised computation | Respondent's statutory notice | Respondent's revised computation | Stipulation | Stipulation increase from return | Stipulation decrease from return | Increase at issue | Decrease at issue |
|---|---|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | | | |
| Professional receipts | $32,804.64 | $36,322.42 | $37,024.55 | $36,322.42 | 36,322.42 | $3,517.78 | | | |
| Rental receipts | 7,380.00 | 9,635.97 | 9,569.70 | 9,635.97 | 9,635.97 | 2,255.97 | | | |
| Sign rental (net) | | 266.82 | 384.00 | 266.82 | 266.82 | 266.82 | | | |
| Interest income | 213.32 | 215.63 | 1,578.24 | 1,578.24 | | 2.31 | | 1,362.61 | |
| Gain on sale | | | | 540.30 | 540.30 | 540.30 | | | |
| *Expenses* | | | | | | | | | |
| Medical practice expenses | (25,406.79) | (12,994.68) | (24,101.79) | (12,494.68) | | 12,412.11 | | 500.00 | |
| Rental business | | (9,149.16) | | (8,648.28) | | | $8,648.28 | | $500.88 |
| Home use for business | | (600.00) | | (300.00) | | | 300.00 | | 300.00 |
| *Depreciation* | | | | | | | | | |
| Medical equipment | (6,556.22) | (1,226.41) | (3,578.30) | (1,226.41) | (1,226.41) | 5,329.81 | | | 2,763.82 |
| Rental business | | (6,480.12) | | (3,716.30) | | | ¹3,716.30 | | 435.00 |
| Dental office improvements | | | | (435.00) | | | | | 435.00 |
| 1960 building costs | | | | (887.59) | | | | | 887.59 |
| Car depreciation | | | | (369.63) | | | | | 369.63 |
| Standard deduction | (835.56) | (1,000.00) | (1,000.00) | (1,000.00) | (1,000.00) | | 164.50 | | |
| Exemptions | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | (3,000.00) | | | | |
| Totals | | | | | | 24,325.10 | 12,829.08 | 1,862.61 | 5,256.92 |

¹ This item is in fact a concession by respondent and not a stipulated figure. It is used here only to explain the amount still in issue without using a separate column.

1963

| | Per petitioners' return | Petitioners' revised computation | Respondent's statutory notice | Respondent's revised computation | Stipulation | Stipulation increase from return | Stipulation decrease from return | Increase at issue | Decrease at issue |
|---|---|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | | | |
| Professional receipts | $32,639.56 | $34,634.28 | $37,196.47 | $34,634.28 | $34,634.28 | $1,994.72 | | | |
| Peterson sale | | 1,411.22 | | 1,411.22 | 1,411.22 | 1,411.22 | | | |
| Loss on fishing boat (including depreciation) | (367.56) | (367.56) | | | | | | $367.56 | |
| *Expenses* | | | | | | | | | |
| Home use for business | (600.00) | (600.00) | | (300.00) | (300.00) | | $300.00 | | $300.00 |
| *Depreciation* | | | | | | | | | |
| Medical equipment | (6,556.22) | (5,832.11) | (3,131.61) | (1,226.41) | (1,226.41) | 5,329.81 | | | 2,490.46 |
| Rental buildings and clinic | | (1,226.41) | | (3,716.87) | | | 1,226.41 | | 887.59 |
| Dental office improvements | | | | (887.59) | | | | | 217.50 |
| 1960 building costs | | | | (217.50) | | | | | 369.63 |
| Additional car depreciation | | | | (369.63) | | | | | |
| *Credits* | | | | | | | | | |
| Investment credit on boat | (450.52) | (450.52) | | | | | | 450.52 | |
| Totals | | | | | | 8,735.75 | 1,526.41 | 818.08 | 4,285.18 |

Petitioner Henry M. Rodney was indicted under section 7201 for willful attempt to evade Federal income tax by filing false and fraudulent returns for each of the years 1959, 1960, 1961, and 1962. He entered a plea of not guilty and was tried and found guilty as charged by the jury for each of these years. Petitioner Lucille H. Rodney was not a party to that action.

Petitioners on their Federal income tax returns reported income and claimed deductible expenses in the amounts which we have set forth in our findings.

Respondent mailed to petitioners a notice of deficiency for the year 1960 on March 27, 1964, and mailed to petitioners a notice of deficiency for the years 1957 through 1959 and 1961 through 1963 on November 17, 1967. In these notices of deficiency, respondent made the adjustments to the income and expenses reported on petitioners' returns as we have heretofore set forth. Respondent in his notices of deficiency also determined that for each of the years here in issue all or part of the underpayment of tax by petitioners as set forth in his notices of deficiency was due to fraud and therefore petitioners were liable for the 50-percent addition to tax for fraud provided by section 6653(b).

Petitioners in their petition for each of the years in issue except the year 1960 allege that the determination of any deficiency is barred by the statute of limitations. Respondent in his answer with respect to each of the years here in issue alleges that the assessment of deficiencies is not barred by the statute of limitations since the returns filed by petitioners were false and fraudulent with intent to evade tax. For the year 1963 respondent, in addition, alleges that the parties have by agreement extended the statute of limitations to December 31, 1967, and that the notice of deficiency issued on November 17, 1967, was within the time of that extension.

OPINION

The facts here clearly show that for each of the years here in issue except 1960 and 1963, the assessment of any deficiency against either petitioner is barred by the statute of limitations unless the returns for those years filed by petitioners were false and fraudulent. For the year 1960 the statutory notice was issued within the 3-year period after the filing of the return and for the year 1963 the evidence shows that the notice was issued within the period of an extension which was agreed to by both the petitioners and respondent prior to the expiration of the period within which assessment of a deficiency for that year could properly be made. Respondent has determined that petitioners are liable for the 50-percent addition to tax for fraud for each of the years here in issue.

In this case respondent offered no proof of fraud. In his brief he explained this lack of proof with respect to the years 1959 through 1962 with the following statement: "An examination of the record in this case will disclose that the respondent introduced absolutely no evidence of fraud on the part of the petitioners for the conviction years, choosing instead to rely entirely on the collateral estoppel concept."

In his reply brief he states, "Respondent chose not to produce evidence of fraud for the conviction years of 1959–62. To do so would have been repetitious and time consuming."

Respondent's argument with respect to the years 1957, 1958, and 1963 is primarily that these years show a consistent pattern with the years in which respondent contends petitioners are estopped from denying fraud because of Henry M. Rodney's criminal conviction. In substance respondent's argument amounts to a contention that it is not incumbent upon him to establish fraud in the other years since petitioners are estopped to deny fraud with respect to the years for which Henry M. Rodney was convicted of fraudulent attempt to evade Federal income taxes. Respondent primarily relies in the years 1957 and 1958 on petitioner's failure to include in income all of his professional receipts from the practice of medicine and rental income from a clinic and office building owned by petitioners. However, the record shows that for the year 1957 the agreed computation of petitioner's professional receipts is only $484.58 in excess of the amount reported by petitioner on his return. This amount appears to consist of a yearend payment to petitioner for services rendered to patients in 1956. The lack of fraud in the omission of this yearend payment is adequately shown by the fact that petitioner's books and records showed the items and that petitioner relied on the accountant who prepared his return to include all items of income shown on his books and records. In 1958 the agreed computation of receipts by petitioner from the practice of medicine is only $1,426.05 in excess of the amount reported by petitioner on his return and this omission is likewise adequately explained. The record shows that petitioner did omit receipts from the rental of his buildings in the amount of $3,455.97 for the year 1957 and $6,378.61 for the year 1958. However, the record also shows that petitioner failed to deduct rental business expenses for these years in amounts now agreed by respondent to be at least $5,272.35 and $11,-413.33 for the years 1957 and 1958, respectively, without consideration of any allowance for depreciation for these years with respect to the buildings. Petitioners claim a greater amount of deductions with respect to the buildings than the amount conceded by respondent because of claiming a greater amount of depreciation than respondent concedes to be proper. Whether the deductions are in excess of the

amounts agreed to by respondent for these years is one of the issues still here present. The substance of respondent's claim with respect to the failure to include the building operations in petitioners' returns is that petitioners' returns are false and fraudulent for failure to report a business loss of at least $1,600 in 1 year and $5,000 in another year. Even if an explanation of the reasons for the omissions had not been given by petitioners, we would certainly hesitate to consider failure to report losses in business rental to be indicia of fraud, and it is certainly not the clear and convincing proof of fraud required of respondent. In fact, even were respondent to be successful in all his contentions which remain in this case with respect to the years 1957 and 1958 the resultant deficiencies would be in relatively small amounts.

The remaining difference between the parties with respect to petitioners' taxable income for the year 1963 is greater than in the years 1957 and 1958. However, the major items causing the difference are claimed deductions of the type which give no indication of fraud. We therefore conclude that in 1963 there is also a total lack of any clear and convincing evidence of fraud.

Petitioners contend that under the facts here present neither petitioner should be considered estopped to deny that petitioners' returns for the years 1959 through 1962 were false and fraudulent and that part of the underpayment of tax by petitioners, if any, for these years is due to fraud. They base this contention not only on a legal argument that a criminal conviction does not collaterally estop a taxpayer from denying fraud in a subsequent civil case but also on the fact that the adjustments now stipulated between the parties with respect to petitioners' income for the years 1959 through 1962 show substantial adjustments from the amounts and figures alleged in the indictment and as set forth in respondent's statutory notice.

This Court in *John W. Amos*, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965), and again in *Arctic Ice Cream Co.*, 43 T.C. 68 (1964), held that a criminal conviction for attempt to evade income tax estopped the taxpayer so convicted from denying fraud in a subsequent civil case. We adhere to our holding in those cases and for reasons hereinafter discussed do not consider this case to be distinguishable from those cases with respect to petitioner Henry M. Rodney.

In *Armstrong* v. *United States*, 354 F. 2d 274 (Ct. Cl. 1965), the taxpayer made an argument as to the inapplicability of the doctrine of collateral estoppel similar to the argument made by petitioner here before us. In that case a trial on the merits had been held by a commissioner with respect to whether any part of the taxpayer's underpayment of tax was due to fraud for each of the years 1945 through 1950. The taxpayer there involved had been criminally convicted of

attempted evasion of income taxes for each of the years 1947, 1948, and 1949. The commissioner before whom the case was tried had concluded, based on substantially the same evidence which had been introduced in the criminal trial, that none of the underpayment for the years before him was due to fraud. The court, in discussing the conclusion of the commissioner and the law applied by him stated (354 F. 2d at 290):

> Without disagreeing with the Fifth Circuit or the Tax Court, Commissioner Evans was of the view that the ends of justice would not be served by application of collateral estoppel in these circumstances, now that he had heard all the evidence pertaining to all six years and had determined that Mr. Armstrong had no intent to defraud the Government during any of those years. In large part, the commissioner's view was founded on the position that application of the estoppel doctrine, at the outset, would have precluded any evidence as to the three years covered by the criminal conviction (1947, 1948, 1949), and that it would not serve justice to apply collateral estoppel *nunc pro tunc* and excise all of this evidence.

The Court of Claims without disagreeing with the commissioner's finding, held that (354 F. 2d at 291):

> despite the trial commissioner's finding as to Mr. Armstrong's lack of fraudulent intent. plaintiffs cannot have an adjudication that Mr. Armstrong committed no fraud in 1947, 1948, and 1949. For those years the judgment in the prior criminal case is decisive.

The record in the instant case does not disclose what evidence was produced in the criminal trial. However, it does disclose that Henry M. Rodney pleaded not guilty and was convicted in a jury trial. On the basis of the evidence here present, we hold that Henry M. Rodney is collaterally estopped to deny fraud for the years 1959 through 1962 because of his criminal conviction.

Petitioners further contend that even if we conclude that Henry M. Rodney is estopped to deny fraud for the years for which he was convicted of criminal fraud, petitioner Lucille H. Rodney is not so estopped. Petitioners' position is that collateral estoppel applies only where the action involves both the same issues as the former action and the same parties or a party privy to the party in the former action. Both parties cite and rely on *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). Respondent makes a lengthy argument that for the sake of convenience and conservation of time, a wife who files a joint return with her husband should be considered as a party privy to her husband for the purpose of collateral estoppel where her husband is collaterally estopped from denying fraud because of a former criminal conviction. Although respondent cites numerous cases dealing with privity of parties, he cites none that holds that a wife, either because of her marital status or because of filing a joint income tax return or joint

petition with her husband, is a party privy to her husband. In fact, such a contention would run counter to the long-recognized legal principle that a husband and wife are separate and distinct taxpayers even where they have filed a joint Federal income tax return. See *Marie A. Dolan*, 44 T.C. 420, 428 (1965), and cases there cited.

It has long been recognized by this Court that the husband and wife who file a joint return and joint petition to this Court are separate taxpayers and that the record must form a basis for entry of a decision as to each. *Harry B. Nordstrom*, 50 T.C. 30 (1968), involved a joint petition filed by Harry B. and Dorothy K. Nordstrom seeking a redetermination of a deficiency set forth in a joint notice of deficiency which respondent had sent to them. The case was calendared for trial and when the case was called a settlement stipulation signed by Dorothy K. Nordstrom and respondent's counsel was filed. Respondent filed a motion to dismiss as to Harry B. Nordstrom and to determine the deficiencies and additions to tax as set out in the motion. In support of his motion respondent alleged that Harry B. Nordstrom had died and no representative of his estate had been appointed. In our opinion we pointed out that we did not lose jurisdiction of a case because of the death of a party and set forth a procedure for disposition of the case. The importance of that case to the problem here at issue is that if a husband and wife who filed a joint return and joint petition to this Court were parties in privity solely because of that fact, then the stipulation signed by the wife and respondent's counsel should have made the determination res judicata as to the husband and a determination against the husband on such a basis would have been proper. The fact that a determination for a particular year against a husband who filed a joint return for that year with his wife is not res judicata against the wife for the same year is the underlying basis of our holding in *Nadine I. Davenport*, 48 T.C. 921 (1967). The inescapable conclusion from these cases and others of similar import is that a wife who files a joint return with her husband is not a party privy to her husband in litigation before this Court.

In *Moore* v. *United States*, 360 F. 2d 353, 357 (C.A. 4, 1965), the court stated with respect to a wife's being collaterally estopped to deny fraud because of the criminal conviction of her husband as follows:

We conclude, however, that the wife, who was not a party to the criminal proceeding, should not be estopped by the finding of fraud against her husband * * *

We are mindful of what may be a contrary position taken by the Tax Court in Thomas Worcester, Inc. v. Commissioner, P–H Memo. T.C. par. 65,199 (1965). There the court stated that:

"Even if we were to agree with Elizabeth [the wife] that she is not collaterally estopped by the prior criminal conviction of Thomas [her husband] to deny fraud

in the instant case, her liability on the fraud issue (being joint and several) would still be controlled by a finding of fraud against Thomas. In other words, it would be completely meaningless, where a joint return has been filed, to reach contradictory results on an issue of fraud."

We agree that Mrs. Moore's joint liability with her husband arises not from her personal fraud, but from that of her husband, but for a finding of fraud on his part to bind her, it must be made in a proceeding to which she is a party. This requirement cannot be satisfied by invoking the estoppel which Mr. Moore's prior criminal conviction works against him, for Mrs. Moore was not a party to the criminal proceeding. Due process requires that she be accorded her day in court on the issue of her husband's fraud. Her right in the civil proceeding to contest her husband's fraud may not be denied by pointing to her husband's prior criminal conviction, nor should his conviction prejudice her position in the civil proceedings.

Our Memorandum Opinion referred to in the *Moore* case (*Thomas Worcester, Inc.,* T.C. Memo. 1965–199), did not hold that the wife was collaterally estopped by the husband's conviction to deny the fraud. It considered it meaningless to decide the issue where a joint return had been filed. In that case we found that respondent had proved fraud even though the husband was collaterally estopped to deny fraud for certain years. In numerous cases we have held that a wife who files a joint return with her husband is liable for fraud penalties where his fraud is proved by respondent.

Respondent has called our attention to no case, nor have we found one, which holds a wife to be collaterally estopped by a prior action against her husband where she was not a party to the prior action. *Surber* v. *United States,* 285 F. Supp. 775, 779 (S.D. Ohio 1968), following *Moore* v. *United States, supra,* holds that she is not so estopped. Such cases as *Tomlinson* v. *Lefkowitz,* 334 F. 2d 262, 266 (C.A. 5, 1964), apparently recognize that the wife is not estopped by her husband's conviction since they based denial of recovery to her on her failure to show any payment made with her funds. See also, to this same effect, *Ginsberg* v. *Tomlinson,* 393 F. 2d 136 (C.A. 5, 1968). We therefore conclude that petitioner Lucille H. Rodney is not collaterally estopped to deny either that the returns filed by her and her husband were false and fraudulent with intent to evade tax so as to lift the bar of the statute of limitations or that a part of the underpayment for each of the years here in issue was due to fraud with intent to evade tax.

Respondent, however, contends that even if we find petitioner Lucille H. Rodney is not collaterally estopped, it is a meaningless gesture since she would be liable for the tax because of having filed a joint return with her husband. In support of this contention, he cites some of the numerous cases holding that where respondent proves in a civil proceeding that the joint return filed by a husband and wife is false

and fraudulent because of the husband's fraud the bar of the statute of limitations is inapplicable as to both the husband and wife and the addition to tax for fraud is collectible from the wife as well as from the husband because of the joint and several liability created by statute where a joint return is filed. See *Michael Pendola*, 50 T.C. 509, 521 (1968), citing a number of these cases. However, the fact that petitioner Henry M. Rodney is estopped to deny fraud does not mean that respondent has proved that the returns filed by Henry M. Rodney were false and fraudulent or that any underpayment in tax was due to fraud but rather means that because Henry M. Rodney is collaterally estopped to deny fraud respondent does not have to establish fraud insofar as Henry M. Rodney is concerned.

In *Jack Douglas*, 27 T.C. 306, 315 (1956), affirmed on another issue sub nom. *Sullivan* v. *Commissioner*, 256 F. 2d 4 (C.A. 5, 1958), we refused to hold that respondent had proved fraud against a wife by the stipulated admission of fraud by her husband. In that case, the taxpayers, Jack Douglas and Dorothy Sullivan (formerly Dorothy Douglas), had, for the year 1947 when they were husband and wife, filed a joint Federal income tax return. Respondent had mailed to them a joint notice of deficiency addressed to Jack Douglas and Dorothy Douglas, husband and wife, for the year 1947, determining a deficiency and additions to tax for fraud, and a joint petition for the year was filed by them contesting the deficiency and addition to tax. Prior to the trial of the case, Jack Douglas and respondent entered into a stipulation agreeing to the correctness of the deficiency and additions to tax for the year 1947 as determined by respondent and the stipulation was filed with the Court. Respondent contended that Dorothy was bound by the stipulation and that the deficiency and additions to tax should be determined against her by the Court. With respect to the determination of the additions to tax for fraud against Dorothy we stated (27 T.C. at 315):

The law places upon the Commissioner the burden of proof to show that part of the deficiency is due to fraud with intent to evade tax. The Commissioner introduced no evidence of any kind to show that any part of the deficiency determined against Dorothy for the year 1947 is due to fraud with intent to evade the tax. His only reliance, in contending that Dorothy is liable for the addition to tax for fraud which he has imposed for the year 1947, is the stipulation which he filed at the hearing signed by Richard A. Jennings, as counsel for petitioner Jack Douglas, and by John Potts Barnes, Chief Counsel, Internal Revenue Service, in which it is agreed that Jack is liable for the addition to tax for fraud of $1,455.76 for the year 1947. * * * Dorothy had nothing whatever to do with the preparation or the filing of this stipulation. While, no doubt, the stipulation is binding upon Jack as to the deficiencies determined against him and also the additions to tax for fraud, it is not binding upon Dorothy.

We hold that Dorothy is liable for the deficiency in income tax for the year 1947 because the determination by the Commissioner of the deficiency is pre-

sumptively correct. She is not liable for the addition to tax for fraud because the Commissioner has not borne his burden of proof so far as Dorothy is concerned. * * *

We see no distinction in the instant case where Henry M. Rodney is liable for the additions to tax for fraud because he is estopped to deny fraud, but his wife, Lucille H. Rodney, is not estopped, and the *Jack Douglas* case where the husband had admitted fraud by a stipulation binding on him but the wife had not participated in or agreed to the stipulation. Here, as in *Jack Douglas*, the Commissioner has not borne his burden of proof of fraud as to the wife.

This Court and other courts have held that a wife who filed a joint return with her husband after the date the return was due was not liable for additions to tax for her husband's fraudulent failure to file a timely return. *Spanos* v. *United States*, 323 F. 2d 108 (C.A. 4, 1963), and *Cirillo* v. *Commissioner*, 314 F. 2d 478 (C.A. 3, 1963), affirming on this issue a Memorandum Opinion of this Court. In *Spanos* v. *United States, supra*, the taxpayer was a widow, her husband having died in September 1956. The taxpayer's husband had fraudulently, with intent to evade tax, failed to file a Federal income tax return for the calendar year 1955 when such return was due to be filed on April 15, 1956. On July 2, 1956, the taxpayer and her husband had filed a joint return correctly reporting their 1955 income. The taxpayer had no taxable income of her own for the year 1955. The Court of Appeals held, relying on *Cirillo* v. *Commissioner, supra*, that the wife was liable for the tax since she had filed a joint return with her husband but was not liable for the addition to tax for fraud since the addition to tax for fraud arose from conduct of her husband before the wife joined in the accurate, honest joint return.

While the factual situation in *Spanos* v. *United States, supra*, and *Cirillo* v. *Commissioner, supra*, is quite different from that in the instant case, those cases hold that a wife is not liable for an addition to tax for fraud merely because her husband is so liable and she filed a joint return with him. A wife who is herself innocent of any fraud who filed a joint return with her husband is liable for the addition to taxes for fraud only if respondent establishes that because of her husband's fraudulent actions, a part of the underpayment of tax is due to fraud.

The fact that Henry M. Rodney is estopped to deny that his income tax returns for 1959 through 1962 are false and fraudulent does not mean that respondent has established by proof the fact of such fraud. Because of the doctrine of collateral estoppel respondent is relieved of the duty to establish fraud as to the person who is collaterally estopped to deny such fraud. However, he is not relieved of the duty

to prove the fraud by clear and convincing evidence as to any other person.

On the basis of the record in this case we conclude that respondent has failed to establish that the returns filed by Henry M. and Lucille H. Rodney for the taxable years 1957, 1958, and 1963 were false and fraudulent or that for 1963 any part of the underpayment of tax was due to fraud with intent to evade tax. For the years 1957 and 1958 the assessment or collection of any deficiency is barred by the statute of limitations. For the year 1960 the deficiency notice was timely and this year is not barred by the statute of limitations. For the year 1963 a valid waiver extending the statute of limitations was filed and the deficiency notice was issued within the period as so extended. Therefore, a deficiency for the year 1963 is not barred by the statute of limitations.

For the years 1959 through 1962, we hold that Henry M. Rodney is collaterally estopped to deny fraud and therefore as to him the returns for those years are deemed to be false and fraudulent so that the determination of deficiencies is not barred as to him for the years 1959, 1961, and 1962. Because he is collaterally estopped to deny fraud for these years, it is also deemed that a part of the underpayment in tax, if any, by Henry M. Rodney for each of the years 1959 through 1962 is due to fraud with intent to evade tax. We therefore sustain respondent's determination of additions to tax for fraud for the years 1959 through 1962 as to Henry M. Rodney.

Since Lucille H. Rodney is not collaterally estopped to deny fraud for any of the years 1959 through 1962 and respondent has failed to prove by clear and convincing evidence that the joint returns filed by Henry M. and Lucille H. Rodney for each of those years were false and fraudulent, the determination of any tax against Lucille H. Rodney for each of these years except 1960 is barred by the statute of limitations.

Since we have concluded that the determination of any tax for the years 1957 and 1958 is barred by the statute of limitations, we will not discuss the merits of any issues with respect to petitioners' tax liability for those years. The discussion of the issues as to the tax liability for the years 1959, 1961, and 1962 applies only to the determination of such liabilities against Henry M. Rodney, but for the years 1960 and 1963 the discussion of issues with respect to the determination of the amount of the deficiencies, if any, applies to both petitioners.

*Issues With Respect to Respondent's Additions to Petitioner's Income*

(a) *Lease Payments Under the Agreement With Charles Mellon.*— As set forth in our Findings of Fact, Mary Rodney advanced $2,175

to be used to decorate the suite of dental offices which petitioner later leased to Charles Mellon for a monthly rental of $150. A portion of the rent was used to repay the loan made by Mary Rodney. It is petitioner's position that the portion of the monthly rental used to repay the loan is not includable in his income. Respondent contends that the amount is income to petitioner. The resolution of this issue is dependent upon whether the portion of the rental income paid to Mary Rodney discharged an obligation between petitioner and Mary Rodney, or between Charles Mellon and Mary Rodney. There is nothing in the record to show whether the loan by Mary Rodney was made to petitioner or to Charles Mellon. If the obligation was from petitioner to Mary Rodney, the payment of that obligation, directly or indirectly by Charles Mellon, would result in taxable income to petitioner, in that it would have relieved him of a personal obligation. See *Tressler* v. *Commissioner*, 228 F. 2d 356 (C.A. 9, 1955) (and cases cited in fn. 6), affirming a Memorandum Opinion of this Court.

The record does not disclose the nature of or principals to the loan made by Mary Rodney and therefore petitioners have failed to show error in respondent's determination.

(b) *Interest.*—In October of 1959 petitioner sold personal property to Curtis F. Peterson on a conditional-sales contract. At that time he also loaned Peterson $9,500, with an additional loan of $2,000 in February of 1960. The two loans were evidenced by notes calling for 6-percent interest per year with principal and interest being payable in monthly installments of specified amounts. Petitioner's conditional-sales contract provided for interest at $6\frac{1}{2}$ percent per annum on the monthly deferred payments, with principal and interest payable monthly in specified amounts.

Petitioners have not included in their income any portion of the payments received on these obligations, asserting that they do not realize income from these transactions until they fully recover the capital advanced or basis of the property sold. Respondent contends that the stipulated interest of $6\frac{1}{2}$ percent per annum provided for in each of the transactions is realized by the petitioner as a prorata portion of each payment received.

A debtor and creditor have the right to earmark the amount of a deferred payment between principal and interest and where such an allocation is made the interest income of the creditor is the amount so agreed upon. *Huntington-Redondo Co.*, 36 B.T.A. 116 (1937). Where there is no allocation made by the parties the general rule is that the amount shall first be applied to liquidation of the interest due before any part is applied to the principal. *Helvering* v. *Drier*, 79 F. 2d 501, 503 (C.A. 4, 1935), affirming a Memorandum Opinion of this Court.

The conditional-sales contract specifically provided for interest. The escrow statement for escrow No. 15194 submitted by the Spokane and Eastern Branch of the Seattle First National Bank indicates that as each payment was made the bank, acting as agent for the parties, allocated such payment between interest and principal.

The parties also agreed to the 6½-percent interest rate on the notes involved in the loan transactions. Each monthly payment, by the very terms of the notes, included the interest due at the time the installment was paid. The collecting agent also made allocations between principal and interest as to each payment received.

We therefore hold that petitioner is not entitled to recover his entire basis in the property sold under the October contract or to recover his capital under the notes before allocating any of the payments received pursuant thereto to interest but must instead allocate each payment as received between interest and principal, with interest being computed at 6½ percent per year.

In 1957 petitioners and another couple sold a duplex owned jointly by them to Edsel G. Maggard and his wife, receiving as part of the sales price a contract on another property which was given a discounted value by the parties as a credit on the sales price in the statement of the closing of the transaction. Respondent contends that the contract should be valued at the 10-percent discount agreed upon by the parties to the sale, and that 10 percent of each payment received should be considered in the nature of interest.

Petitioners argue that the contract should be valued at its face amount at the time of the sale of the duplex, resulting in no interest allocation to any payment. Petitioners claim a capital loss of $157.77 upon the sale of the contract in 1959 at 10-percent discount.

The Court has recognized that the present value of a dollar due at some time in the future decreases as the maturity date is postponed. *John Q. Shunk*, 10 T.C. 293 (1948), reversed on another issue 173 F. 2d 747 (C.A. 6, 1949). Thus a contract payable in future installments is unlikely to be valued in the present at its full face value. The only evidence introduced relating to the value of the contract was the fact that it was valued by the parties at the time of receipt at a 10-percent discount, and was discounted at that same rate when it was sold in 1959. On the basis of the evidence in this case we conclude that petitioners have failed to establish that respondent erred in including a portion of each payment received on the contract in their income as in the nature of interest or that they sustained a loss on the sale of the contract.

Petitioner seems to consider that the situation here is comparable to that where a taxpayer sells property in return for a cash downpay-

ment and a mere contractual right to future installments. In such cases the taxpayer is allowed to recover his basis in the property sold prior to reporting any gain. *Nina J. Ennis*, 17 T.C. 465 (1951). The rationale of this line of decisions is that under section 1001(a) the gain from the sale or other disposition of the property is equal to the excess of the amount realized over the adjusted basis of the property sold. Under section 1001(b) the amount realized is equal to the sum of any money received and the fair market value of any property other than money received. The cases have held that a mere contractual obligation to receive future payments is not property with a fair market value which is a part of the amount realized on the sale. These cases relate only to the amount realized from the sale or other disposition of property and do not relate to whether interest income is received by a taxpayer.

Petitioner raises the issue of the proper amount of interest income from bank deposits in 1961 and 1962. Petitioner contends that he need not include in his income in 1961 the amount of 5 cents interest from a Canadian bank account and interest in the amount of $156.71 in 1962 from savings account No. 15071, with the Citizens Savings & Loan Society opened by petitioners to insure funds for the education of their daughter.

Petitioner makes no legal argument as to the interest from the Canadian account. Petitioners contend that the savings account in Citizens Savings & Loan Society was a gift to their child. However, they have the burden of proving that the gift was effective for tax purposes. The tax effect of a gift is governed by the degree of control over the res retained by the donor. Compare *Edward H. Heller*, 41 B.T.A. 1020 (1940), with *Richardson* v. *Smith*, 102 F. 2d 697 (C.A. 2, 1939). The law will not recognize as effective for tax purposes a gift where the donor retains such a degree of control over the res that it may be used substantially for his own benefit without regard to the interests of the donee. See *Richardson* v. *Smith, supra.*

Lucille H. Rodney testified that the money was intended for the purpose designated and was ultimately so used. However, the account card indicates that there were several small withdrawals during the year 1962 which are nowhere explained in the record. Petitioner's evidence is not sufficient to indicate the nature of his relationship toward the moneys upon deposit in the account. Petitioners have not introduced evidence of the extent of their control, or absence of control, over the account. Petitioners have not, therefore, sustained their burden of proof and we find for respondent as to this issue.

(c) *Unexplained Deposits.*—Respondent has included in petitioners' income for the year 1960 the sum of $354.29 attributable to unex-

plained deposits in the Research and Development account during the year 1960. Respondent has also included in petitioner's income for the year 1961 the sum of $120 attributable to unexplained deposits in the General Realty account during 1961. Neither petitioner nor respondent has introduced any evidence relating directly to these deposits, although petitioner introduced extensive evidence relating to the methodology used in his office practice relating to the receipts and deposits of moneys from his professional activities.

The proof of bank deposits standing alone does not establish the receipt of income. See *Goe* v. *Commissioner*, 198 F. 2d 851 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court. However, where from surrounding circumstances it is a fair inference that the deposit is made up of income, it is proper for the Commissioner to make a determination on that ground. See *Hague Estate* v. *Commissioner*, 132 F. 2d 775 (C.A. 2, 1943), affirming 45 B.T.A. 104 (1941). There is a presumption that such determinations made by the Commissioner are correct, and the burden falls upon petitioner to prove otherwise. *Thomas B. Jones*, 29 T.C. 601 (1957), and *Axel Holmstrom*, 35 B.T.A. 1092 (1937).

In the instant case petitioner was unable to recall the precise source for any of the deposits making up the amounts in question.

Petitioner has argued that it is likely that the sums represent nothing more than funds withdrawn from the bank and redeposited. However, petitioner has presented no evidence which would tend to support his assertion that the sums are redeposits. The *de minimis* nature of the deposits is not of itself sufficient to substitute for proof of whether they represent income. *Zeeman* v. *United States*, 395 F. 2d 861 (C.A. 2, 1968).

We are not justified in overturning respondent's determination without evidence of the nature of the deposits. We therefore find for respondent on this issue.

### Deductions Disallowed in Whole or in Part

(a) *Depreciation.*—Depreciation on their clinic building was computed by petitioners on their 1959 and subsequent returns under the straight-line method, using a basis of $174,802. Petitioner now claims a basis of $103,866.44 and respondent contends that petitioner's basis is $74,337.46. The difference between the parties is composed of two items. One of the items is an amount of $5,600 representing the cost to petitioner of his attempt to acquire a site for the building different from the site finally acquired. Petitioner has cited no authority for including this cost as a part of the cost of the building he placed on the property he finally acquired and we have found no authority to

support petitioner's position. The other difference between the parties is the amount of the cost of the buildings paid by petitioner in cash. Petitioner claims a cost of $23,929 more than that determined by respondent on the basis of payments in cash. The evidence supports petitioner's contentions and we have found that petitioner made the cash payment. We, therefore, hold that petitioner's unadjusted basis in the clinic buildings for the purposes of computing depreciation is $98,266.46.

Petitioner further contends that since he claimed no depreciation on the clinic buildings on his 1957 return he is entitled to elect the declining-balance method of depreciation even though on his return for 1959, the first year depreciation was claimed, he used the straight-line method.

Section 167(a) and (b) authorizes a reasonable allowance for wear and tear of property used in a trade or business or held for the production of income and gives the taxpayer a choice of methods to be used in computing that allowance. Sections 1.167(c)–1(a) and (c) and 1.167(e)–1(a), Income Tax Regs., provide as follows:

Sec. 1.167(c)–1. Limitations on methods of computing depreciation under section 167(b) (2), (3), and (4).

(a) *In general.* (1) Section 167(c) provides limitations on the use of the declining balance method described in section 167(b) (2), the sum of the years-digits method described in section 167(b) (3), and certain other methods authorized by section 167(b) (4). These methods are applicable only to tangible property having a useful life of three years or more. * * *

*     *     *     *     *     *     *

(c) *Election to use methods.* Subject to the limitations set forth in paragraph (a) of this section, the methods of computing the allowance for depreciation specified in section 167(b) (2), (3), and (4) may be adopted without permission and no formal election is required. In order for a taxpayer to elect to use these methods for any property described in paragraph (a) of this section, he need only compute depreciation thereon under any of these methods for any taxable year ending after December 31, 1953, in which the property may first be depreciated by him. * * *

Sec. 1.167(e)–1. Change in method.

(a) *In general.* Any change in the method of computing the depreciation allowances with respect to a particular account is a change in method of accounting, and such a change will be permitted only with the consent of the Commissioner, except that the change from the declining balance method to the straight line method as provided in section 167(e) shall be permitted without consent. ** *

Petitioner contends that his election for the year 1959 was a nullity since it was not timely as provided under section 1.167(c)–1(c) of the regulations. A similar contention was raised by the taxpayer in *Missouri Public Service Co.* v. *United States,* 370 F. 2d 971 (C.A. 8, 1967). In that case, however, the straight-line depreciation method had been used in the taxpayer's 1954, 1955, and 1957 returns. In 1956 it had used

the declining-balance method. Upon audit in 1958 it was determined that depreciation on the property was not deductible in 1954 since the property was not put into actual use until 1955. Thus, the first year's depreciation was disallowed. Thereafter, the taxpayer filed claims for refund, amending its tax returns for 1955, 1956, and 1957 to claim depreciation deductions computed on the subject property by the declining-balance method rather than the previously claimed straight-line method. The taxpayer claimed that its original election of the straight-line method was premature and therefore not binding on the subsequent years, arguing that section 1.167(c)–1(c), Income Tax Regs., provides that the election is made by computing depreciation by the method chosen in the first year the property could properly be depreciated, and that because of the premature year used by the taxpayer the election made in the first such year was not binding, being void *ab initio*. The court stated (370 F. 2d at 975) :

Taxpayer made its choice of election either by first adopting a method of depreciation and abortively applying to a year not allowable or by continuing the use of its selected method on the following years' returns. * * * Taxpayer's good faith is not the touchstone and should not be used as a springboard for its belated hindsight.

Similarly, this Court in *Clinton H. Mitchell*, 42 T.C. 953 (1964), held that the method of depreciation used by a taxpayer in a year subsequent to the first allowable year may be binding upon the prior year. In *Mitchell*, the taxpayer made a tentative election in the first allowable year and thereafter continued the method in a succeeding year's final return. We held that the later use made the preceding year's tentative election binding. If subsequent use will make a tentative election binding, we see no reason not to impute an election made in a year after the first year the property could properly be depreciated to the appropriate year where the taxpayer has inadvertently made an election in the wrong year. In either case, the taxpayer has had his opportunity to make his choice. It is the taxpayer's choice of year that is in error, not his choice of method. *Missouri Public Service Co.* v. *United States*, *supra*. We hold that petitioner is required to use the straight-line method of depreciation for the years 1959 through 1963. The parties have agreed to a useful life of the property of 20 years.

(b) *Deductibility of Insurance Premiums.*—Petitioners borrowed money to finance the construction of the clinic buildings. The largest source of such borrowed funds was Great Northwestern Life Insurance Co. of Spokane, Wash. As part of the consideration for financing the petitioners' enterprise, Great Northwestern required petitioner to insure his life with it for a sum sufficient to secure the debts incurred. In case of petitioner's death the proceeds were to be used to pay off the

mortgage. It is petitioner's position that the premiums for this insurance are deductible business expenses or expenses for the production of income. It is clear that the policy was taken out for the purpose of acquiring financing for buildings used in petitioner's profession or rental business, and therefore the premiums might be considered a business expense to the petitioner except for the provisions of section 264(a)(1). *Richard M. Glassner*, 43 T.C. 713 (1965), affirmed per curiam 360 F. 2d 33 (C.A. 3, 1966), certiorari denied 385 U.S. 819.

Section 264(a)(1)[2] provides that no deduction may be taken for premiums paid on a life insurance policy covering the life of any person financially interested in the trade or business of the taxpayer when the taxpayer is directly or indirectly a beneficiary under the policy.

That the petitioner was thoroughly financially interested in his own trade or business is so apparent that it needs no further comment. The cases under predecessor statutes to section 264(a)(1) hold that there is a direct or indirect benefit to the taxpayer where the insurance would ultimately pay off the loan. *Rieck v. Heiner*, 25 F. 2d 453 (C.A. 3, 1928), dealing with section 215(a)(4) of the Revenue Act of 1921, held that a policy taken out by the taxpayer to be used as collateral on a loan fell within the "direct or indirect" beneficiary language "for if it [the policy] had matured when held as collateral, and payment had been made to the creditor, it would indirectly have augmented his estate by decreasing his liabilities. Or if it had matured after it was returned to him by the creditor and payment had been made to the estate the taxable [sic] would have benefited directly." There is such benefit whether the policy has the petitioner's estate, *William S. Phillips*, 24 B.T.A. 98 (1931), or a creditor named a beneficiary. *Klein v. Commissioner*, 84 F. 2d 310 (C.A. 7, 1936), affirming 31 B.T.A. 910 (1934). This line of cases has recently been affirmed by this Court in its decision in *Richard M. Glassner, supra.* In the case before us the

---

[2] SEC. 264. CERTAIN AMOUNTS PAID IN CONNECTION WITH INSURANCE CONTRACTS.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Premiums paid on any life insurance policy covering the life of any officer or employee, or of any person financially interested in any trade or business carried on by the taxpayer, when the taxpayer is directly or indirectly a beneficiary under such policy.

(2) Any amount paid or accrued on indebtedness incurred or continued to purchase or carry a single premium life insurance, endowment, or annuity contract.

(3) Except as provided in subsection (c), any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance, endowment, or annuity contract (other than a single premium contract or a contract treated as a single premium contract) pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract (either from the insurer or otherwise).

Paragraph (2) shall apply in respect of annuity contracts only as to contracts purchased after March 1, 1954. Paragraph (3) shall apply only in respect of contracts purchased after August 6, 1963.

beneficiary of the policy is not in evidence, but it is stipulated that the policy proceeds would be used to pay off the mortgage indebtedness thereby enhancing the value of the petitioner's estate. Under the line of cases cited above, the petitioner would be benefited directly or indirectly within the meaning of section 264(a)(1), and a deduction for the premiums is precluded by section 264(a)(1).

(c) *Reasonable Allowance for Home Use and Business Expense.*—Petitioner contends and respondent has so stipulated that he is entitled to a reasonable allowance for the portion of his home used as an office. Respondent in his computations has set as a reasonable allowance the sum of $300 per year. Petitioner has offered no evidence relating to the nature or extent of the use of his home for business purposes. We, therefore, sustain the allowance of $300 per year conceded by respondent because of the failure of petitioner to sustain his burden of proof as to any greater amount.

Respondent has made a determination that $500 of the claimed deduction by petitioner for business expenses in each of the years 1959 through 1962 represent personal expenditures. Petitioner meets this determination with the statement that he had made ample allowance for personal expenditures. Petitioner has introduced no evidence to substantiate the amount of his business expenses, except for a check spread for the years involved. The check spread does not indicate the nature of the expenses for which the checks were issued but merely names the payee of each individual check. The majority of the checks, on their face, do not reveal the nature of the expenses they represent. Since petitioner has introduced no further evidence as to his business expenses, we sustain respondent's disallowance of $500 for each of the years 1959 through 1962.

(d) *Deduction for Alleged Flood Repair.*—Respondent has determined that the expenditures made by petitioners in 1960 for the alleged repair of the damage caused in the basement of the clinic building by freezing and flooding that year were capital expenditures for new construction and reconditioning and therefore not deductible.

Petitioners introduced no evidence whatsoever to overcome the presumption in favor of respondent's determination. The sole evidence of the events out of which these claimed deductions arose are several bills indicating the costs of certain work done for the petitioner relating to "flood control" and "repairs and rewiring." In addition petitioners introduced a document designated as an affidavit of three individuals which indicates that during the year in question a flood did occur necessitating certain repair and expenditures. However, there is no connection between any of the bills presented and the alleged flood damage nor was any evidence introduced as to the nature of the repairs for which the bills were rendered.

Because of petitioner's failure of proof we find for respondent on this issue.

(e) *Legal Expenses.*—Petitioner claims a deduction for the payment of $350 to an attorney to settle any possible civil action which might arise out of an altercation in which petitioner was involved. In his capacity as house doctor for a local hotel in Spokane, Wash., petitioner was removing a patient from the hotel when an altercation ensued because petitioner felt that a third party was attempting to obstruct him and prevent him from removing his patient. As a consequence of the altercation, petitioner paid $350 to an unnamed attorney for a fee and to settle any possible consequences arising out of the incident.

Any claim for a deduction arising out of such an expenditure must come under either section 162 or section 212. The same criteria apply to the deduction of legal expenses under either of those sections, and it is therefore not necessary to differentiate between a trade or business or activities for the production of income for the purpose of determining this issue.

It is also unnecessary to determine what portion of the amount expended was in settlement of the claim and what portion was the payment of legal fees since amounts expended for either are deductible if paid in connection with a taxpayer's trade or business or income-producing activities.

To be deductible under section 212 or 162, expenditures must be ordinary and necessary and proximately related to the income-producing activities or a trade or business of the taxpayer. The cases are clear that legal expenses incurred in a proceeding directly connected with and proximately resulting from the ordinary and legitimate business transactions of a taxpayer are deductible. *John W. Clark*, 30 T.C. 1330, 1335 (1958), and cases there cited. However, the fact that the settlement or expenditure is made to protect petitioner from unfavorable publicity which would harm his profession, trade or business, or income-producing activity by the injury it would do to his reputation, is not sufficient to cause the payment to be deductible where the underlying claim did not arise out of some business activity. See *Kerwin H. Fulton*, 41 B.T.A. 1037, 1043 (1940), affd. 128 F. 2d 740 (C.A. 2, 1942).

In the instant case we consider the evidence sufficient to show that the altercation out of which any potential claim against petitioner would have arisen was proximately related to his activities as a physician and arose during his pursuit of that occupation. Although the evidence is not overwhelming, we find that petitioner has sustained his burden of proving that the payment of $350 for legal expenses was an ordinary and necessary expense incident to his trade, business, or income-producing activities. We hold petitioner is entitled to a deduction for the $350.

(f) *Car Lease.*—Petitioner claims as a business deduction an amount paid to Northwest Service, Inc., in prepaying an automobile lease. The automobile was procured for petitioner through a leasing company by his cousin, an officer in that company. Respondent determined that the payment actually represents the purchase of an automobile and is therefore a capital expense.

The only question before the Court is whether the transaction in question is a bona fide lease or a disguised purchase. Petitioner did not introduce a copy of the agreement under which he acquired the car, and the evidence indicates that the parties did not consider the transaction to be a valid and subsisting lease. We do not need to reach the question of whether mere prepayment of rentals due under an otherwise valid lease would make the transaction a capital outlay rather than a deductible expense, since petitioner has failed to sustain his burden of proving the validity of the lease. The evidence supports respondent's position that the transaction should be considered as the purchase of depreciable property.

(g) *Bon Selene.*—Petitioner contends that he is entitled to an investment credit and a business expense deduction in connection with the purchase, outfitting, and operation of the *Bon Selene,* a boat owned by him. Respondent has determined that the vessel is a pleasure craft and thus does not give rise to the claimed credit and deduction.

Petitioner has not sustained his burden of proving respondent's determination to be in error. Petitioner has introduced no evidence as to the nature of the use of the craft other than the fact that it was licensed for salmon trolling on the Puget Sound in 1964. Whether it engaged in such an enterprise is not shown by the evidence. We sustain respondent's disallowance of the deductions claimed by petitioner in connection with the *Bon Selene.*

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

TANNENWALD, *J.*, concurring: I agree with the conclusion reached by the majority, but I would avoid polarization on the issue of privity which seems to characterize both the majority and dissenting opinions.

Prior to 1938, section 51 (b) merely provided that a husband and wife living together might each make a return or make a single joint return, in which case "the tax shall be computed on the aggregate income." Sec. 51 (b), Revenue Act of 1936, 49 Stat. 1648, 1670. Under the section and its predecessors, not only was there no suggestion in the decided cases that a spouse was estopped by the other spouse's conviction for

fraud,[1] but there was a conflict as to whether a spouse who signed a joint return was liable for the entire tax shown to be due or only for that proportionate part of the total tax as was represented by his or her net income. Compare *Cole* v. *Commissioner*, 81 F. 2d 485 (C.A. 9, 1935), with *Myrna S. Howell*, 10 T.C. 859, 867–868 (1948), affirmed per curiam 175 F. 2d 240 (C.A. 6, 1949). In order "that any doubt as to the existence of such liability should be set at rest" (H. Rept. No. 1860, 75th Cong., 3d Sess., p. 30 (1938)), the section was amended at the time of the enactment of the Revenue Act of 1938 (52 Stat. 447, 476); the previously quoted language from the 1936 Act was retained and the phrase "and the liability with respect to the tax shall be joint and several" was added. The identical language was incorporated in section 51(b) of the 1939 Code and section 6013(d)(3) of the 1954 Code.

In the foregoing context, it seems clear that section 6013(d)(3) does no more than mandate joint and several liability "*after such liability has been established.*" See *Natalie D. Du Mais*, 40 T.C. 269, 272 (1963); *Marie A. Dolan*, 44 T.C. 420, 426, fn. 10 (1965). The issue in this case is the manner in which the liability is to be established and on that score the statute is silent. As we stated in *Marie A. Dolan*, 44 T.C. at 426–427:

> Section 6013 [9] provides that the tax liability of a husband and wife who file a joint return shall be joint and several. Inasmuch as the statute nowhere spells out the consequences of joint and several liability, it has been held that Congress intended the common law rules to apply. *United States* v. *Wainer*, 211 F. 2d 669, 673 (C.A. 7, 1954).[10] See *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 687 (1962); *First Savings & Loan Association*, 40 T.C. 474, 482 (1963). [Footnotes omitted.]

The obligee of a joint and several obligation may proceed separately against each obligor. See *Marie A. Dolan*, 44 T.C. at 427, and cases cited therein; Restatement, Judgments, sec. 101 (1942). A judgment against one obligor is not a basis for collateral estoppel against another; each joint and several obligor is entitled to be heard on the merits of the claim asserted against him. See Restatement, Judgments, sec. 94 (1942).

Understandably, it has not been suggested that there is privity per se between a husband and wife. Cf. *Locomotive Engineers Mut. Life & Ins. Ass'n* v. *Laurent*, 172 F. 2d 889 (C.A. 7, 1949); *Sasser* v. *First Joint Stock Land Bank*, 99 F. 2d 744 (C.A. 5, 1938); *Jack Douglas*, 27 T.C. 306, 315 (1956), affirmed sub nom. *Sullivan* v. *Commissioner*, 256 F. 2d. 4 (C.A. 5, 1958). The argument that the joint and several liability requirement of section 6013(d)(3) either creates a statutory privity between spouses or makes a finding of privity unnecessary

---

[1] Indeed, until 1964, this Court had held that the criminal conviction did not even estop the convicted spouse. See *John W. Amos*, 43 T.C. 50, 56 (1964), aff'd. 360 F. 2d 358 (C.A. 4, 1965).

begs the essential issue herein. That issue, in its simplest terms, is whether the requirements of judicial convenience demand that we construe section 6013 (d) (3) as against a spouse who has not been shown to be a party to the other spouse's fraud; who in no way participated, nor even had the opportunity to participate, in the *criminal* proceeding in which that fraud was established; and who, if he or she is not afforded an opportunity to litigate the issue of fraud, will automatically be liable for a substantial addition to any deficiency found to be due. To state the question is to answer it, especially where the statutory provision does not specifically deal with the problem and the construction sought by respondent raises a serious constitutional question. See *Lucas v. Alexander*, 279 U.S. 573, 577 (1929) ; *Postal Telegraph Cable Co. v. Newport*, 247 U.S. 464, 476 (1918) ; 1 Mertens, Law of Federal Income Taxation, sec. 3.36. To say that in the criminal proceeding a spouse represents the other spouse's interests with respect to civil liabilities ignores the realities of life; holding the other spouse automatically bound by virtue of the signature on the joint return is equally applicable where there is a plea of guilty in the criminal proceeding—a step the pleader might be more than willing to take in the hope of receiving a lighter or suspended sentence. Cf. *Arctic Ice Cream Co.*, 43 T.C. 68 (1964).

Balancing the various interests involved herein, it is not too much to require that respondent satisfy his burden of proof against Lucille H. Rodney by presenting evidence of her husband's fraud and not by relying exclusively on the latter's criminal conviction. See Schneidman, "The Civil Fraud Penalty and the Innocent Spouse," 55 A.B.A. J. 994 (Oct. 1969). The extent to which section 6013 (d) (3) may create a bar to the relitigation of issues relating to basic deficiencies or additions to tax not involving criminal aspects will, in my opinion, depend upon the particular facts and circumstances of each situation as it arises and need not be decided here. Compare *Nadine I. Davenport*, 48 T.C. 921, 929 (1967).

DRENNEN, HOYT, FEATHERSTON, and QUEALY, *JJ.*, agree with this concurring opinion.

---

STERRETT, *J.*, concurring in part and dissenting in part. I concur in the opinion of Judge Scott insofar as it relates to the issue of Lucille H. Rodney's liability for the penalty prescribed under section 6653 (b), I.R.C. 1954. However, the opinion, in my view, does not go far enough to remedy the gross inequities presently existing with regard to an innocent spouse in this situation. Even if respondent had introduced proof of Henry M. Rodney's fraud, I would not hold Lucille accountable for the 50-percent fraud penalty. Only if respond-

ent had produced clear and convincing evidence of Lucille's fraud should she be held so answerable.

I am well aware of the long line of authority holding that the joint and several liability provisions contained in section 6013 (d) (3), I.R.C. 1954, and its predecessor (sec. 51 (b), I.R.C. 1939) extends to the civil fraud penalty, notwithstanding that one of the parties to the joint venture may be innocent of the fraud. *Ginsberg's Estate* v. *Commissioner*, 271 F. 2d 511, 513-514 (C.A. 5, 1959); *Furnish* v. *Commissioner*, 262 F. 2d 727, 731-732 (C.A. 9, 1958); *Kann* v. *Commissioner*, 210 F. 2d 247, 252 (C.A. 3, 1953); *Howell* v. *Commissioner*, 175 F. 2d 240, 241 (C.A. 6, 1949); *Michael Pendola*, 50 T.C. 509, 521 (1968), and the cases cited therein.[1] Nevertheless, I find it almost inconceivable that Congress, when enacting the joint and several liability provision, could have intended that the fraud of a wrongdoing spouse should be imputed to an innocent spouse for purposes of imposing the 50-percent fraud penalty. While the above-noted authority[2] to the contrary is considerable, I am convinced that it is time to revisit this area. No legal principle is so deeply imbedded as to be immune from being uprooted when shown to be clearly erroneous.

During the course of such a revisitation, it should be noted that, although the statute speaks in terms of an addition to tax, the 50-percent penalty clearly evidences quasi-criminal characteristics and is commonly referred to as a fraud penalty with all the stigma that attaches to such a characterization. Its quasi-criminal nature is apparent from the fact that the Commissioner has the burden of proving the requisite fraudulent intent to evade the tax by clear and convincing evidence. This burden, while not as stringent as that in a criminal case, is much heavier than the usual burden the taxpayer bears in challenging a proposed deficiency determination. *Valetti* v. *Commissioner*, 260 F. 2d 185, 188 (C.A. 3, 1958). Imposition of this quasi-criminal sanction should be limited to those persons who harbor the proscribed evil intent.

It is with respect to the question of the innocent spouse's liability for the underlying deficiency that I dissent from the majority's holding. I would hold the criminally convicted spouse collaterally estopped from denying the fraudulent nature of the return. Therefore, having found the return to be fraudulent, I would hold that the statute of

[1] I have grave doubts that the law would be in its present form if the original cases (i.e., *Helvering* v. *Mitchell*, 303 U.S. 391 (1938)) could have arisen in the context of an innocent spouse being held liable for the fraud penalty.

[2] It can be argued that sec. 6659 lends additional support to the result reached by the above-mentioned line of authority inasmuch as that section states that the word "tax" as used in the Code (and more particularly as it is used in sec. 6013 (d) (3)) shall include "additions to the tax, additional amounts, and penalties." To the extent that this section applies to the 50-percent fraud penalty, I believe it is intended to deal with the situation where both spouses are party to the fraud. I do not believe that Congress by the enactment of this Code provision is addressing itself to the issue discussed herein.

limitations is no bar to the assertion of a deficiency against the innocent spouse under the joint liability provisions of the Code. He or she should fare no better by virtue of having unknowingly cosigned a fraudulent return rather than an honest one.

---

DAWSON, *J.*, dissenting in part: I respectfully dissent from the holding that Lucille Rodney is not collaterally estopped as to the fraud on the joint Federal income tax returns filed with her husband for the years 1959 through 1962. I disagree with the views expressed in the majority opinion and its reliance upon what I consider to be the erroneous rationale and conclusion reached in *Moore v. United States*, 360 F. 2d 353, (C.A. 4, 1965).

The principles and guidelines for the application of collateral estoppel are contained and delineated in the bellwether opinion of the Supreme Court in *Commissioner v. Sunnen*, 333 U.S. 591 (1948). The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit *and their privies* are thereafter bound, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. *Commissioner v. Sunnen, supra* at 597. Once a party *or his privy* has fought out a matter in litigation with the other party, the duel cannot be renewed.

The nitty-gritty of this case is whether the joint returns signed by Henry and Lucille Rodney created a "privity," statutory or otherwise, between them which will permit a determination that the fraud of the husband binds both of them to the returns so that they are liable for the deficiencies and fraud penalties.[1] I think the required "privity" exists in this case by virtue of section 6013(d)(3) which specifically provides that liability with respect to a joint return is "joint and several." Persons filing a joint income tax return are treated as a single taxable unit." *Taft v. Helvering*, 311 U.S. 195 (1940). There is only *one* income. A finding of fraud, which in this case is conclusively established by the judgment of conviction in the criminal tax action against Henry Rodney, directly affects the joint returns and directly affects and conclusively binds both Henry and Lucille on those returns.

---

[1] It is well settled that a wife who is a party to a *fraudulent* return may be held liable for the fraud penalties assessed on account of her husband's fraud in preparing the return, notwithstanding that she had no income, did not have any fraudulent intent and did not know the return was fraudulent. See *Ginsberg's Estate v. Commissioner*, 271 F. 2d 511 (C.A. 5, 1959); *Kann v. Commissioner*, 210 F. 2d 247 (C.A. 3, 1953); *Howell v. Commissioner*, 175 F. 2d 240 (C.A. 6, 1949); *Michael Pendola*, 50 T.C. 509, 521–522 (1968), and other cases cited therein. This principle is firmly embedded in the law and is not susceptible to being uprooted because of the circumstances present in this case. See secs. 6013 and 6659, I.R.C. 1954.

The "single taxable unit" concept must of necessity be so effected because in terms of causes of action each taxable year is a separate cause of action. *Commissioner* v. *Sunnen*, *supra*. What the majority opinion proposes to do is to *divide* that "single taxable unit" and to *divide* this single cause of action in order to relitigate a prior determination on the *fraud issue* unfavorable to one party to the joint returns. This means that Henry and Lucille, although jointly and severally liable for the tax and additions to tax on the joint returns, are found to be liable for different amounts since Lucille is held not liable for some of the deficiencies and the fraud penalties. Such a result is incongruous and emasculates the joint and several liability provisions of section 6013 (d) (3) [2] with respect to joint returns.

The "privity" between Lucille and Henry Rodney came into existence at the moment they signed the joint returns and elected to avail themselves of the privilege of filing joint returns and enjoyed the tax benefits of minimizing their liability. This "privity" continues and carries over to any litigation, criminal or civil, where the liability created by the joint returns is in controversy. "Privity" is a shorthand way of establishing that an individual is not a "stranger" to an action and is affected by a decision in such action. In *United States* v. *California Bridge Co.*, 245 U.S. 337, 341 (1917), the Supreme Court said:

The doctrine of estoppel by judgment, or *res judicata*, as a practical matter, proceeds upon the principle that one person shall not a second time litigate, *with the same person or with another so identified in interest with such person that he represents the same legal right*, * * * [Emphasis added.]

"Privity" in the sense of "identity of interests" has been broadly applied. See *Tait* v. *Western Md. Ry. Co.*, 289 U.S. 620 (1933) ; Vestal, "Preclusion/Res Judicata Variables: Parties" 50 Iowa L. Rev. 27, 59–66 (1964). This Court has long recognized that "privity" between

---

[2] An example will illustrate the violence done to the concept of joint and several liability : H and W are husband and wife. They filed a joint income tax return for 1966. They are divorced in 1967 with H living in New York and W in California. The 1966 return is audited and the Commissioner determines that a casualty loss claimed on the return should be disallowed. A separate joint notice of deficiency is sent to each. W, who has insufficient funds to pay the amount of the deficiency, files a petition in the Tax Court for a redetermination, tries her case, and loses, resulting in a deficiency of $2,000. H, who has money, pays the amount of the asserted deficiency, files a claim for refund, and when it is disallowed sues in the U.S. District Court in New York for the recovery of $2,000. Under the majority opinion, H would not be collaterally estopped but could relitigate the casualty loss issue. If H prevailed in the District Court the same issue would be decided differently and H would recover $2,000 on a judgment against the Government. Thus the same issue would be litigated twice, contrary to the doctrine of collateral estoppel, and joint and several liability on the joint returns would be defeated. The injection of an addition to tax for fraud, or fraud resulting from a criminal conviction of one spouse, would not alter the result contained in this example, even though the burden of proving fraud falls on the Government.

a corporation and its shareholder exists, precluding an individual shareholder from relitigating a question previously determined in an action involving his corporation. See and compare *D. Bruce Forrester*, 4 T.C. 907, 918 (1945); *American Range Lines, Inc.*, 17 T.C. 764, 771 (1951); and *Seaboard Commercial Corporation*, 28 T.C. 1034, 1047 (1957). And a transferee is "privy" to a transferor. *David Krueger*, 48 T.C. 824, 830 (1967). Certainly, if a corporation and its shareholders, and a transferee and transferor, are in "privity" because of the nature of their relationships, parties whose tax liability depends upon the single, joint returns filed jointly by them stand in a much closer relationship. A husband and wife who file joint returns have identical interests with respect to their legal rights and obligations on such returns. They have combined their income and deductions in order to receive split-income benefits, and each has promised to accept joint and several liability with respect to tax, including any additions to it. Consequently, "identity of interests" created by joint returns established the "privity" required for application of collateral estoppel.

In addition, there may also be "contractual privity." The essence of the joint return concept involves two contracts. First, the husband and wife form a bilateral contract when they sign the joint return and agree to be jointly and severally liable for all taxes and additions. The consideration for each party to enter into the contract is that individual taxpayers either separately or as a family unit derive pecuniary benefit from the split-income effect of joint returns. Secondly, each spouse becomes a third party beneficiary of a contract between the Government and the other spouse establishing joint and several liability in exchange for the split-income benefits. Without such agreement neither spouse could reap the benefits. The *tax returns* are the *subject matter* that give rise to "privity" between the husband and wife. When Henry was convicted in the U.S. District Court of willful tax evasion in filing the joint returns for the years 1959 through 1962, the *underlying issue* decided was that *the returns were fraudulent*. Lucille now seeks to question that ultimate finding of fraud as to the returns. According to the doctrine of collateral estoppel, Lucille, as a "privy" to Henry in the criminal action, should be precluded in this subsequent Tax Court proceeding from relitigating the ultimate issue of fraud already decided. The *issue of fraud* has been determined and fixed. Further litigation of the same *issue* should be barred. See and compare *United States* v. *Citizens National T. & S. Bank of L. A.*, 166 F. Supp. 410, (1958), affd. 270 F. 2d 128 (C.A. 9, 1959).

I see no denial of "due process" in this case. When collateral estoppel is properly applicable, there is no constitutional infirmity. The re-

quirement of "due process" is satisfied.[3] Lucille has already had her "day in court" on the *issue* of her husband's fraud. Her interests were adequately represented in the criminal action. Henry defended the *fraud issue*, and he had every incentive to succeed. In defending the criminal action, he was certainly aware of the fact that a subsequent civil proceeding with respect to the same issue of fraud might arise. Hence it is unreasonable to think that he would "hold back" any evidence in his defense of fraud. Since it is reasonable to assume that he was aware of the statute that made his wife jointly and severally liable for any civil fraud penalties, Henry was defending not only his own interests on the fraud issue in the criminal trial but also those of his wife. It is elementary that Henry was in a much better position in the criminal case than Lucille would be now to contest respondent's evidence of his fraud, and yet he was unable to raise even a reasonable doubt as to his willfulness in the minds of the jury. To compel respondent now to present the same evidence against the wife would impose a task resulting in administrative inconvenience which would far outweigh the practical possibilities of the wife's being able to disprove what her husband could not previously disprove. Moreover, under the rule created by the majority here, Lucille would be free to offer any evidence augmenting Henry's defense in the criminal case. Indeed, there would be nothing to prevent her from offering Henry's testimony in an attempt to disprove his fraud. If he may now be heard to contest the finding of fraud implicit in the prior criminal conviction, then the District Court's decision is seriously undermined and the doctrine of collateral estoppel becomes a hollow principle.

The important fact is that there has already been a full and fair opportunity to litigate the fraud issue. And, of course, Lucille has had her "day in court" in this proceeding as to the correctness of the deficiencies. It is my view that Lucille has had her interests protected as to the *fraud issue* at the expense of her husband's conviction and it must be said that her "day in court" on that *issue* has now passed. To hold otherwise would inject the possibility of contradictory results on the issue of fraud when the husband and wife have elected to file joint returns by which both are bound.

---

[3] It is clear that Congress carefully delineated the consequences of joint and several liability when it considered the filing of a joint return to be a *privilege*, and the imposition of joint and several liability upon taxpayers electing to enjoy this *privilege* a necessary concomitant. See H.Rept. No. 1860, 75th Cong., 3d Sess., pp. 29–30, which states in pertinent part:

"Section 51(b) of the bill expressly provides that the spouses, who exercise the *privilege* of filing a joint return, are jointly and severally liable for the tax computed upon their aggregate income. *It is necessary, for administrative reasons, that any doubt as to the existence of such liability should be set at rest,* if the privilege of filing such joint returns is continued. [Emphasis added.]"

The cases of *Jack Douglas*, 27 T.C. 306 (1956), *Nadine I. Davenport*, 48 T.C. 921 (1967), and *Marie A. Dolan*, 44 T.C. 420 (1965), cited in the majority opinion, are clearly distinguishable. None of those cases involved collateral estoppel. Since collateral estoppel is an affirmative defense, it must be both pleaded and proved. It was not pleaded and proved in the *Douglas*, *Davenport*, and *Dolan* cases. Futhermore, collateral estoppel requires a prior adjudication on the merits of the issue presented. Insofar as collateral estoppel is concerned, a stipulated decision is totally different than a litigated decision. *United States* v. *International Bldg. Co.*, 345 U.S. 502 (1953). Unlike the situation in *Douglas* and *Davenport*, an issue cannot be treated by this Court in one manner for one signer of a joint return and in another manner for the other party to the return where the question is litigated. The concept that a joint return is a "single taxable unit" would clearly preclude such treatment.

The cases of *Spanos* v. *United States*, 323 F. 2d 108 (C.A. 4, 1963), and *Cirillo* v. *Commissioner*, 314 F. 2d 478 (C.A. 3, 1963), are also distinguishable, as apparently acknowledged in the majority opinion. In those cases the wife was held not liable for the fraud penalties attributable to the husband's fraudulent failure to file a timely return because such penalties were fully accrued, assessable, and collectible before she had joined in the accurate joint return.

Distilled to its simplest terms, what we have here is "privity" created when the joint returns were signed, and collateral estoppel which conclusively established the joint returns as false and fraudulent, thus rendering the proof of fraud by respondent unnecessary as to either the husband or the wife. Since the joint returns are *fraudulent*, it follows, as a matter of law, that the joint and several liability for both husband and wife is subject to the imposition of the fraud penalties. Likewise, the *fraudulent* returns permit the tax deficiencies to be assessed at any time. Sec. 6501(c)(1).

For the foregoing reasons I would decide this issue for respondent and hold that Lucille Rodney is also liable for the full amount of the deficiencies and additions to tax under section 6653(b) for the years 1959 through 1962.

TIETJENS, RAUM, ATKINS, FAY, and SIMPSON, *JJ.*, agree with this dissent.