DWIGHT E. PARKS AND PEGGY J. PARKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Parks v. Commissioner
Docket No. 4368-84
United States Tax Court
T.C. Memo 1990-281; 1990 Tax Ct. Memo LEXIS 300; 59 T.C.M. (CCH) 803; T.C.M. (RIA) 90281; June 5, 1990, Filed *300 Decision will be entered under Rule 155. Held: Deficiencies redetermined; fraud addition found under doctrine of collateral estoppel. Michael P. Carnes, for the petitioner Peggy J. Parks. W. V. Dunnam, for the petitioner Dwight E. Parks. Richard D. Ames, for the respondent. WHITAKER, Judge. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax against petitioners for the calendar years 1978 and 1979 in the following amounts: Addition to Tax
Year
Deficiency
Section 6653(b) [1]
1978
$ 166,477.22
$ 83,238.61
1979
69,858.00
34,929.00 Both the deficiencies and the additions to tax for fraud are in issue. In addition, if we hold against respondent on the fraud issue, we will be required to decide whether the 6-year statute of limitations under section 6501(e)(1) is applicable. The deficiencies are predicated upon respondent's determination that petitioners diverted funds from Cin- Lynn Properties, Inc. (Cin-Lynn) for their own benefit. *301 FINDINGS OF FACT Background
Some of the facts have been stipulated and they are so found. During the years 1978 and 1979 petitioners Dwight Parks and Peggy Parks were husband and wife and resided in Waco, Texas. They were married in 1975. For these years they filed joint Federal income tax returns. Mrs. Parks has only a high school education. Mrs. Parks has a son by a prior marriage who during these years resided with her. Mr. Parks' two daughters by his prior marriage did not reside in the Parks' household. In October 1981, Mrs. Parks filed a petition for divorce which was ultimately withdrawn, although Mr. and Mrs. Parks were not living together at the time of trial. On May 28, 1978, Mr. Parks was convicted of a Federal drug-related offense. He was incarceratedfrom that date until February 9, 1981, in several different prisons including Leavenworth. While there, as a result of a prisoner strike, Mr. Parks received death threats. In February 1983, petitioners were both indicted for evasion of income tax under section 7201 for each of the calendar years 1978 and 1979. Mr. Parks was found guilty as charged and Mrs. Parks was acquitted. Mr. Parks' conviction was upheld on *302 appeal. During 1971, apparently in connection with his divorce from his former wife, Mr. Parks caused Cin-Lynn to be incorporated with all of the capital stock issued to Mr. Parks' daughters, Cindy Parks and Lynn Parks. Apparently through the years involved, Mr. Parks served as president of Cin-Lynn and up to his incarceration exercised exclusive management control. Cin-Lynn was used by Mr. Parks as a vehicle for conducting many, if not most, of his business affairs, including the acquisition, development, rental, and sale of real estate. Notwithstanding the ownership of stock by his daughters, who had reached adulthood prior to 1978, Mr. Parks appears to have treated Cin-Lynn as though wholly owned by him. There is no evidence that either daughter objected. At somepoint prior to the years in issue Mrs. Parks was appointed secretary of Cin-Lynn. She became employed by Cin-Lynn in 1971, continuing to perform secretarial and clerical duties which she had been doing for Mr. Parks since the 1960's. Cin-Lynn's offices were from time to time in various buildings owned by Cin-Lynn. When Mr. Parks was incarcerated, sole responsibility for handling the businesses of Cin-Lynn fell on *303 Mrs. Parks, assisted by her husband's attorney Mike Beard. Mr. Parks had complete confidence in both Mrs. Parks and Mr. Beard and left to their discretion the handling of Cin-Lynn's business affairs, with such infrequent policy directions as he was able to give. In general, but with certain minor exceptions as noted herein, Mrs. Parks and Mr. Beard used their best judgment to handle these business affairs for the benefit of Cin-Lynn. While in jail Mr. Parks directed Mrs. Parks to file necessary Federal tax returns and to report correctly all transactions. Following this direction, Mrs. Parks delivered to Cameron Talbert, Mr. Parks' certified public accountant, information used for tax return preparation of Cin-Lynn's returns for the years 1978 and 1979. She alsoprepared certain schedules attached to those returns. The 1978 return was signed by Mrs. Parks as secretary of Cin-Lynn and by Mr. Talbert as preparer. The 1979 return was signed by Mr. Parks as president and by Mr. Talbert. The individual returns of Mr. and Mrs. Parks were similarly prepared by Mr. Talbert for 1978 and 1979. Of immediate concern to Mrs. Parks in June 1978 was the completion of a building on 901-917 Lake *304 Air Drive, construction of which had been begun by Mr. Parks through Cin-Lynn as owner of the property. (See below under heading "901-917 Lake Air Drive.") Shortly after her husband was incarcerated, Mrs. Parks received Cin-Lynn monies which required depositing into a Cin-Lynn bank account. In the course of preparing to make the deposit into an account at Central National Bank, Mrs. Parks was told by a bank official that the money could be deposited but that she could not withdraw it because she did not have signature authority over that account. Therefore, on July 31, 1978, Mrs. Parks established a checking account in Central National Bank styled "Peggy Parks Commercial Account" (the Commercial Account). This account was used primarily for the deposit ofthe proceeds of the Hewitt Mobile Home sale (see below under heading "Mobile Home Park") and income received from 901-917 Lake Air Drive property. During 1978, all disbursements from the Commercial Account were made for the benefit of Cin-Lynn. However, during 1979 the aggregate sum of $ 1,823.83 was expended from the account for the personal benefit of Mrs. Parks and her son. A television set purchased in 1979 with funds from *305 the Commercial Account was used exclusively in Cin-Lynn's offices and was not a personal expenditure for Mrs. Parks' benefit. Also in 1979, Mrs. Parks caused Cin-Lynn to lend $ 4,600 to her mother which was used to pay the balance of a mortgage on her mother's residence. A demand promissory note was given to reflect the loan but up to the time of trial no interest had been paid on the note. Prior to the time of Mr. Parks' incarceration, Mrs. Parks drew money from Cin-Lynn for her personal needs from time to time, although Mr. Parks provided the principal support for the family, presumably from his Cin-Lynn compensation. After his incarceration Mrs. Parks withdrew funds from various Cin-Lynn businesses for her own support. Respondent has not questionedthese withdrawals. Thus we assume that they were properly reported for tax purposes. The deficiencies in this case arise principally out of respondent's determinations that petitioners diverted or converted to their own use properties and funds of Cin-Lynn. These include the Parks' residence at 2453 Charboneau in Waco, Texas; a mobile home park, legal title to which apparently was in Mr. Parks' name as trustee for his daughters, *306 although the property was treated as an asset of Cin-Lynn; real property known as 901-917 Lake Air Drive upon which a building was under construction in May 1978; $ 80,000 of the sale proceeds of a motel known as Motel 11; the proceeds of the sale of a Cessna aircraft; and part of the proceeds of the sale of the properties known as Parkstown Apartments. With the exception of the residence, these properties were sold by Mrs. Parks to unrelated third parties with Mr. Beard's help in 1978 and 1979, in part at the general direction of Mr. Parks. In addition Cin-Lynn was caused to pay the attorney fees incurred by Mr. Parks in his criminal trial. 2453 Charboneau
In 1975 Cin-Lynn purchased a lot known as 2453 Charboneau in Waco, Texas, on which a housewas constructed during 1975 and 1976. Cin-Lynn paid all the costs of purchasing the lot and constructing the house. Some of these disbursements for construction costs were charged to other businesses owned by Cin-Lynn. Upon completion of construction Mr. and Mrs. Parks used this property as their joint residence until Mr. Parks' incarceration. Mrs. Parks continued to reside in the house during 1978 and 1979 and was still residing there *307 at the time of trial. Prior to 1978 this property had been used by Cin-Lynn as security for a loan made by Marlin National Bank. In April 1978 the loan was renewed in the amount of $ 65,699.46 and again secured by deed of trust on this property. In April 1979 the loan was again renewed for $ 54,996.78 and a new deed of trust executed by Cin-Lynn and petitioners individually. During the period 1976 to August 1981, the dwelling was insured for $ 72,000 with the insurance reduced in August 1981 to $ 70,000. However, financial statements prepared for Cin-Lynn as of June 1, 1976, and June 1, 1977, showed the house and lot as having a value of $ 125,000. When Mr. Parks went to jail in 1978, he wanted Mrs. Parks to obtain title to the residence sothat she would have that much financial security. Mr. Parks had already arranged with his two daughters to cause Cin-Lynn to deed the residence to Mrs. Parks free and clear of the lien if Mr. Parks died in prison. Shortly after going to prison Mr. Parks signed in blank and gave to Mr. Beard two deeds, one to be used to deed the residence to Mrs. Parks and the other the mobile home park. Mr. Beard was given complete discretion to handle both *308 transactions. By deed dated July 25, 1978, Mr. Beard caused the residence to be deeded to Mrs. Parks as her separate property. The deed was recorded on September 8, 1978. At that time, the property was still subject to the lien of the April 19, 1978, deed of trust. On September 5, 1978, at the direction of Mr. Beard, Mrs. Parks executed a promissory note in favor of Cin-Lynn in the amount of $ 50,000 with interest at 6 percent. The note was intended to be consideration for the transfer of the property to Mrs. Parks. On December 12, 1978, she paid $ 500 to Cin-Lynn on account of the note. No other payments were made on the note. Mrs. Parks was unable to pay the $ 50,000 note or the balance due on the secured loan, payments on which weremade by Cin-Lynn. Demands were made upon Mrs. Parks in 1982 for payment. Whether these demands were made in connection with the divorce proceedings filed by Mrs. Parks or for other reasons, we do not know. On May 2, 1983, the property was deeded back to Cin-Lynn by Mrs. Parks in consideration of the assumption of the secured indebtedness then owed to the Waco branch of Central Texas Savings and Loan Association (Central Texas) [2] and the cancellation *309 of the $ 50,000 note. For the years 1977 and 1978, Cin-Lynn paid the property taxes on this property. It is unclear whether Cin-Lynn or Mrs. Parks paid these taxes in 1979 and later years. Mrs. Parks paid the utilities. No rent was paid to Cin-Lynn on the residence prior to 1978 or after May 2, 1983. However, atthe time of trial and apparently for some period prior to that, Mrs. Parks paid the maintenance cost of the residence. Respondent treated the residence as having a value of $ 125,000 with the entire value diverted by petitioners to their benefit during the year 1978. Although no appraisal testimony was presented, during July and September 1978, we find that the value of the Charboneau property was in the range of $ 110,000 to $ 125,000. Mobile Home Park
Sometime prior to 1978 a trust of which Mr. Parks was trustee for the benefit of his two daughters, Cindy and Lynn Parks, acquired or developed a mobile home park described as Hewitt *310 Mobile Home. It is unclear on this record whether the mobile home park was constructed on land then owned by Cin-Lynn or how or why the property was treated as belonging to Cin-Lynn. However, Cin-Lynn's financial statement dated June 1, 1977, includes a mobile home park valued at $ 59,000. Cin-Lynn's corporate returns for the years 1976, 1977, and 1978 include the income and expenses of a mobile home park. The second deed previously signed by Mr. Parks in blank was completed by Mr. Beard, dated July 18, 1978, and used to effect the transferof title to the mobile home park to Mrs. Parks. Mr. Parks believed that operation of the mobile home park was more than Mrs. Parks could handle by herself and that the property should be sold. It was to facilitate that sale that the property was transferred into her name. Why the deed was not used to transfer title to the purchaser is unclear. By deed dated November 24, 1978, Mrs. Parks sold the mobile home park to one Glidden O'Connor for $ 40,000 with a $ 10,000 down payment and a $ 30,000 installment note made payable to Mrs. Parks. The note was secured by a deed of trust which designated Mr. Beard as trustee. Mrs. Parks actually received *311 $ 8,837.72 out of the down payment, the remainder being consumed by selling expenses. It is unclear when the sale to Mr. O'Connor was actually closed. The deed of trust securing the unpaid balance was not recorded until the end of December 1978. On January 10, 1979, Mrs. Parks purchased a certificate of deposit in her name at Central Texas in the amount of $ 10,000. Funds for the purchase of a certificate of deposit came from a check in the amount of $ 8,837.72 drawn by Abstract and Title Company, reflecting the net portion of the downpayment from the sale of the mobile home park. The date of this check is illegible on the exhibit. The balance came from a check dated January 10, 1979, in the amount of $ 1,062.28 written on Cin-Lynn's account at Texas National Bank. On July 10, 1979, that certificate of deposit was rolled over into another certificate of deposit also in the name of Peggy Parks at Central Texas. On January 7, 1980, the proceeds of the certificate of deposit plus accrued interest was transferred to an account at Central Texas styled "Peggy Parks Tax and Escrow Account." Funds in that account were used to pay taxes and other expenses with respect to Cin-Lynn properties. *312 During the year 1979 Mr. O'Connor made note payments to Mrs. Parks, aggregating $ 3,759.36, all of which were deposited in the Commercial Account. (No payments were made on the note during the year 1978.) Cin-Lynn's 1978 corporate return reported the sale of the mobile home park, including the receipt of the $ 10,000 down payment. During 1980 Mr. O'Connor made monthly payments to Mrs. Parks in the amount of $ 3,759.36. Cin-Lynn's returns for the years 1979 and 1980 reflect the interest received from Mr. O'Connor on the installmentnote. We cannot from this record ascertain the disposition of the installment note payments received by Mrs. Parks in 1980 or of the balance of principal and interest due on the installment sale, on the assumption that it was paid. Respondent treated the $ 40,000 value of the mobile home park as diverted to petitioners in 1978. 901-917 Lake Air Drive
Prior to Mr. Parks' conviction in May 1978, Johnny Whiteside acquired from Wallace Cox land at 901-917 Lake Air Drive for $ 80,500 of which $ 500 was paid in cash. A short-term promissory note for $ 80,000 was given by Mr. Whiteside. Thereafter through his attorney who was Mr. Beard, Mr. Whiteside was put *313 in touch with Mr. Parks. They made an agreement pursuant to which Cin-Lynn purchased the land and assumed the $ 80,000 promissory note. Cin-Lynn further agreed to construct a building and lease space in it to Mr. Whiteside. The deed from Mr. Whiteside to Cin-Lynn was not recorded but instead was held by Mr. Beard apparently at Mr. Parks' direction. The interest rate on the Whiteside note was below the then current rate. Mr. Parks was afraid that if the deed to Cin-Lynn were recorded, Mr. Cox would find out about thattransaction and would insist upon market-rate interest on renewal. By the end of May 1978 when Mr. Parks went to prison, the building was approximately 90-percent complete. On June 1, 1978, at the request of Mr. Beard, Mr. Whiteside conveyed the property to Peggy Parks as her separate property. The deed to Peggy Parks was recorded. Mrs. Parks had no knowledge of the deeding of the property to her until October 1979 when she handled the payment to Mr. Cox of the balance due on the purchase price. Mr. Parks did not instruct Mr. Beard to cause this action to be taken and was not aware of the second deed until well after 1979. Nothing in this record explains the reason *314 for this second deed. [3]
Costs for the construction of the building rented to Mr. Whiteside in the amount of $ 64,699.10were paid by Cin-Lynn in 1978. Between August 1, 1978, and September 6, 1979, Peggy Parks wrote checks each month in the amount of $ 533.33, drawn on her Commercial Account, which checks were deposited into Mr. Beard's trust account to be used to pay interest to Mr. Cox. The monthly interest payments were then made by Mr. Beard. This handling of the interest payments was intended to prevent Mr. Cox from learning that this property had been purchased by Cin-Lynn. On October 11, 1979, Mrs. Parks drew a check on her Commercial Account in the amount of $ 80,159.73 payable to Mr. Cox which paid off the principal and accrued interest due on the note. It was in connection with this transaction that Mrs. Parks learned of the Whiteside deed to her. The check was funded by the proceeds of a loan from CentralTexas, with an $ 80,000 CD owned by Cin-Lynn *315 used as collateral. See discussion below under heading "Motel 11." The building constructed on the 901-917 Lake Air Drive property contained two stories. It was completed in 1978 and rented to Mr. Whiteside. All rental payments on this property were paid by Mr. Whiteside to Mrs. Parks at the direction of Mr. Beard. The building wasrented to Donald J. Dwyer from May 1979 to the early part of 1981. The monthly lease payments on this building were paid to Mrs. Parks. Aggregate lease payments received by Mrs. Parks in 1978 were $ 9,000 and in 1979 $ 19,850. All of these lease payments were deposited into Mrs. Parks' Commercial Account at Central National Bank. The income and expenses pertaining to the leasing of the 901-917 Lake Air Drive property were reported on Cin-Lynn's 1978 and 1979 Federal income tax returns. On May 15, 1981, Mrs. Parks transferred the 901-917 Lake Air Drive property to Cin-Lynn by warranty deed. Respondent taxes to petitioners for the year 1978 the sum of $ 64,699.10 as a diversion of Cin-Lynn funds used in the construction of the building. For 1979 respondent determined that $ 80,000 of Cin-Lynn funds were used to purchase the 901-917 Lake Air Drive *316 property. See discussion under heading "Motel 11." Motel 11
Prior to 1979 Cin-Lynn acquired a motel known as Motel 11. On March 30, 1979, Cin-Lynn sold Motel 11 to Renchor, Inc., for $ 345,000. (We assume Mr. Parks signed the deed as president of Cin-Lynn.) After selling expenses and existing liabilities were paid, Cin-Lynnreceived $ 132,519.82. This sum as deposited by Mrs. Parks in Cin-Lynn's account at Texas National Bank on that day. Also on March 30, 1979, Mrs. Parks transferred $ 120,000 from Cin-Lynn's Texas National Bank account to Central Texas which funds were then used to purchase a savings certificate issued by that institution in the name of Cin-Lynn. On September 27, 1979, the $ 120,000 savings certificate was redeemed and out of the proceeds $ 33,299.45 was transferred to another Cin-Lynn savings account, $ 13,015.77 was transferred to a Cin-Lynn account in Central Texas and used to pay off a loan, and $ 80,000 was transferred into a savings certificate. On October 9, 1979, Mrs. Parks caused Cin-Lynn to borrow $ 80,000 from CentralTexas, using the $ 80,000 savings certificate as collateral. The proceeds of the loan were deposited into Mrs. Parks' Commercial Account *317 and on that date used principally to fund the check for $ 80,159.73 paid to Mr. Cox. The $ 80,000 loan was paid off in April 1980 with funds from the redemption of the $ 80,000 savings certificate. Although not entirely clear from the statutory notice, we assume that it is the transfer of the proceeds of the loan intothe Commercial Account which respondent deemed to be a diversion of funds. Cessna 337 Aircraft
In 1977 Cin-Lynn purchased three aircraft, one of which was a Cessna 337. Income and expenses of these aircraft are reflected on Cin-Lynn's 1977 and 1978 Federal income tax returns. All three aircraft were registered in the name of United Air Services, a trade name used by Cin-Lynn. On September 25, 1978, the Cessna 337 was sold to one Carl May. Mrs. Parks as secretary of United Air Services signed the bill of sale and the sale was reported on Cin-Lynn's 1978 Federal income tax return. On September 25, 1978, Mrs. Parks or Mr. Beard received a check from Carl May in the amount of $ 24,500 as the final payment on the Cessna 337. This check was deposited into Mr. Beard's trust account. On the same date Mr. Beard purchased at First National Bank at Waco a bank money order *318 payable to Peggy Newton in the amount of $ 24,500. Peggy Newton is the maiden name of Mrs. Parks. Mrs Parks used the money order to purchase a certificate of deposit at the Central Texas branch in Temple, Texas, in the amount of $ 24,500. The certificate of deposit was issued in the name of "Peggy Newton, Trusteefor Michael Daron Rhodes," who is Mrs. Parks' son by her former marriage. The address used on the certificate was Mrs. Parks' residence. Mrs. Parks placed the $ 24,500 in her name as trustee for her son in order to conceal the money from Mr. Parks and to insure that there would be some money available for her son in the event of the death of Mr. Parks. This sum with interest was thereafter used to purchase gold Krugerrands. (See below.) Respondent treated the proceeds from the sale of the Cessna 337 as diverted to petitioners in 1978. Legal Fees
Between April and July 1978, Cin-Lynn paid $ 19,000 to the attorney who defended Mr. Parks on the Federal drug charge. There is no evidence that either Mr. or Mrs. Parks ever reimbursed Cin-Lynn for this amount. These payments were treated as additional income to petitioners. Krugerrands
On August 16, 1979, Cin-Lynn borrowed *319 $ 39,315 from Central Texas which funds were deposited into Cin-Lynn's bank account at Lake Air National Bank. The funds were thereupon used by Mrs. Parks to purchase gold Krugerrands from Monex International Limited (Monex). The purchase was made in the names of Mr. and Mrs. Parks. (During 1981, the account was changed into the name of Cin-Lynn.) The $ 24,500 with accrued interest, then totaling $ 26,808.16, reflected in the certificate of deposit issued by the Temple Branch of Central Texas was withdrawn and combined with an additional $ 13,015.17 in funds withdrawn from Cin-Lynn's account at the Waco branch of Central Texas and was used to repay the funds borrowed on August 16, 1979. The $ 13,015.17 was a portion of the proceeds of the sale of the Motel 11. The purchase of the Krugerrands was at the direction of Mr. Parks. On receipt the Krugerrands were placed in a safety deposit box in the name of Peggy Parks. In 1981, within 30 to 40 days after Mr. Parks was released from prison, Mrs. Parks returned one half of the Krugerrands to him and later returned the remaining Krugerrands. The retention of half of the Krugerrands apparently was related to the marital controversy *320 between Mr. and Mrs. Parks. Respondent treated $ 13,015.77 used to purchase Krugerrands as diverted to petitioners in 1979, the $ 24,500 sum having already been taxed to petitioners as a 1978 adjustment. Parkstown Apartments
Sometime prior to 1979 Cin-Lynn acquired property in Waco, Texas, described as the Parkstown Apartments. On November 11, 1979, that property was sold to one Don Dwyer for $ 480,000 of which $ 5,000 was the down payment and $ 48,905.33 was paid at the closing. At the closing a promissory note in the amount of $ 54,125.31 payable to Cin-Lynn within 90 days from the date of sale was delivered, and the purchaser assumed an outstanding mortgage in the amount of $ 330,000. Mr. Dwyer dealt with Mrs. Parks in making the purchase but the deed dated October 30, 1979, was executed by Mr. Parks as president of Cin-Lynn. On November 13, 1979, Mrs. Parks used the sum of $ 48,905.53, received at the closing to purchase a cashier's check issued by Lake Air National Bank payable to Cin-Lynn. On the same day another check in the amount of $ 1,094.47 was drawn on a Cin-Lynn Account at Lake Air National Bank payable to Mike Beard as Trustee. Mr. Beard on November 13, 1979, thereupon *321 deposited the two Cin-Lynn checks [4] totaling $ 50,000 into his trust account, and immediately withdrew $ 50,000 from that account in the form of a check payable to "Peggy Parks" which check was used to acquire a $ 50,000 certificate of deposit at the First National Bank in Waco inthe name of Mrs. Parks. This certificate of deposit with accrued interest was used in part to purchase silver bullion in May 1980 through Monex. The 1980 Federal income tax return of Cin-Lynn reported a loss under the caption of "Monex Silver Speculation" in an amount in excess of $ 67,000. However, Monex records show that the silver bullion was in the names of petitioners. The parties have stipulated that on December 31, 1980, Monex paid to petitioners the sum of $ 35,565.21. On February 19, 1980, the $ 54,124.31 promissory note was paid by Mr. Dwyer to Mrs. Parks. Respondent without explanation determined that $ 50,000 was diverted in 1979 to petitioners. OPINION *322 The aggregate additional income of petitioners for 1978 as result of respondent's adjustmentsis in excess of $ 273,000. For 1979 slightly more than $ 143,000 in funds or assets is treated as diverted from Cin-Lynn to petitioners. Respondent also determined that both petitioners are liable for the addition to tax for fraud. These transactions are discussed under the headings used in our Findings of Fact. 2453 Charboneau
Neither party presented any appraisal testimony with respect to the value of the residence at 2453 Charboneau on July 25, 1978, the date of the deed which conveyed the residence to Mrs. Parks. It is unclear whether the transaction should be treated as effective on that date or on September 8, 1978, the date of recordation. Neither can we determine from this record the exact amount of the outstanding loan secured by the deed of trust on the Charboneau property on this date. We do know that in April 1978 the loan was slightly in excess of $ 65,000 and one year later in April 1979 the loan had been reduced to just under $ 55,000. If we assume that the mortgage payments were level, then on the date of the deed to Mrs. Parks, the principal should have been reduced *323 by approximately one fourth of the annual reduction or approximately $ 2,500. On thisbasis, the principal balance on the date of deed as well as on the date of recordation would have been approximately $ 63,000. The value of Cin-Lynn's equity was therefore the full value on the appropriate date less the secured debt. Mrs. Parks gave her note in the amount of $ 50,000, to Cin-Lynn reflecting apparently a conclusion by Mr. Beard of an equity of approximately $ 113,000. This estimate of value was not unreasonable. By no stretch of the imagination could the transfer of the Charboneau residence to Mrs. Parks be deemed to be a conversion of corporate assets in the amount of $ 125,000, an amount probably in excess of the actual fair market value of the house and lot. Possibly the difference (if any) between the value of the equity and $ 50,000 might be income to Mrs. Parks, but respondent has not raised any alternative issues with respect to this transaction. Respondent's determination was clearly incorrect. There is no evidence of any intent on the part of either petitioner to convert corporate assets by the transfer of title of the residence to Mrs. Parks. Even though title was *324 in Cin-Lynn, Mr. Parks considered the property to be his. He had arranged with hisdaughters to deed the property to Mrs. Parks free and clear of the encumbrance, if he had died in prison. However, Mr. Beard set up the transaction as a purchase in order to protect it from possible attack by the daughters. Both he and Mr. Beard considered its value to be slightly over $ 100,000. The reasons for the transfer are obvious and understandable. In this state of the record we have no basis for concluding that this transaction resulted in any diversion of Cin-Lynn property to petitioners in 1978. We note that respondent did not seek to tax to either petitioner the rental value of the premises prior to the transfer to Mrs. Parks or to tax to her the mortgage payments which Cin-Lynn continued to make from the date of the deed to Mrs. Parks until the date of her retransfer of the property back to Cin-Lynn. Cin-Lynn itself appears to have been treated as the alter ego of Mr. Parks but respondent has not raised that as an issue. On the Charboneau residence issue we hold for petitioners. Mobile Home Park
Respondent fails to recognize the reasonableness of the action taken by Mrs. Parks with *325 Mr. Beard's advice in placing cash and properties in her name for easy disposition. There may have been other and perhaps better ways in which the businesses of Cin-Lynn might have been handled or at least ways of minimizing the parties' exposure to tax controversy. But we find the actions taken by petitioners and Mr. Beard to have been reasonable, based on the explanations given by them. We further find these three individuals to be credible witnesses. Both the Commercial Account and the Tax and Escrow Account were appropriate vehicles for the management of the businesses and properties. The funds in each account were used for Cin-Lynn with the specific exceptions noted in our Findings of Fact. Respondent argues that the return of the funds to Cin-Lynn was an afterthought, caused by respondent's initial audit inquiry in 1981. That ignores, however, the undisputed testimony as to use of the funds in the two bank accounts starting in 1978. Respondent's determination with respect to the conversion of the mobile home park in the amount of its sale price in 1978 is again incorrect. We hold for petitioners on this issue. 901-917 Lake Air Drive
The statutory notice treats the sum *326 of $ 64,699.10 which was used in 1978 for the purchase of "901-917 Lake AirDrive" as used for "the purchase of personal assets." Respondent ignores the fact that this property was purchased by Cin-Lynn from Mr. Cox and deeded to it. It was at all times treated as an asset of Cin-Lynn. Neither Mr. nor Mrs. Parks was aware at the time of its execution that Mr. Beard for reasons not adequately explained on this record caused a second deed to be executed by Mr. Whiteside to Mrs. Parks covering this property. However, at least between the parties, the prior deed to Cin-Lynn was effective and we deem the second deed to have been a nullity. Mrs. Parks and Mr. Beard simply handled this property for Cin-Lynn as best they could. We hold for petitioners on this issue. Motel 11
The sale of Motel 11 generated funds which in part were used in 1979 to repay an $ 80,000 loan by Cin-Lynn from CentralTexas. The loan was used to fund the final installment payment to the seller of the purchase price of the 901-917 Lake Air Drive property. For the reasons discussed under that heading, the $ 80,000 payment benefited Cin-Lynn. Respondent's determination is incorrect. We hold for petitioners on *327 this issue. Cessna 337
The proceeds of the sale of the Cessna337 aircraft in the amount of $ 24,500 were in September 1978 diverted by Mrs. Parks to her own use, although ultimately returned in the following year either to Cin-Lynn or to Mr. Parks. Even if we agreed with petitioners that the purchase of gold Krugerrands was for the benefit of Cin-Lynn, that action taken in 1979 does not cure the 1978 problem. The setting aside of the $ 24,500 for the benefit of Mrs. Parks' son in a manner calculated to conceal that action from Mr. Parks shows an appropriation of this sum by Mrs. Parks for her own benefit. Whether Mrs. Parks' action should be characterized as akin to embezzlement is unclear but at the least the sum is taxable to Mrs. Parks in 1978. We hold for respondent on this issue. Legal Fees
Petitioners' remaining 1978 adjustment is $ 19,000 in legal fees paid by Cin-Lynn for Mr. Parks. Petitioners seek to treat this payment of legal fees either as a mistake on the part of the accountant who prepared the 1978 corporate income tax return or as a proper corporate disbursement to protect Cin-Lynn's chief executive officer. Whether or not a mistake the payment was a diversion *328 of Cin-Lynn assets to the use of Mr. Parks. The criminaltrial on a drug offense has no relation to any legitimate Cin-Lynn business. Respondent's determination to tax that amount to petitioners is correct. Krugerrands
There is also a second issue which arose out of use of the proceeds from the sale of Motel 11. The sum of $ 13,015.77 was combined with the $ 24,500 and interest on that amount (derived from the sale of the aircraft and deposited by Mrs. Parks in an account for the benefit of her son) and used to repay a loan from CentralTexas. This loan had been made to purchase Krugerrands at Mr. Parks' direction. Mrs. Parks testified that she made the purchase for Cin-Lynn's benefit. However, there is simply no evidence other than the testimony of petitioners to show that the Krugerrands were ever treated as Cin-Lynn property. Documentary evidence is to the contrary. The Monex account was in the names of petitioners until 1981. The Krugerrands were delivered to and kept by Mrs. Parks in a bank box apparently in her name. At least there is nothing in the record to indicate the box was in the name of Cin-Lynn. She delivered them to Mr. Parks. There is no evidence that Mr. *329 Parks treated the gold as property of Cin-Lynn. Accordingly the sum of $ 13,015.77 is taxable to petitioners in 1979. Parkstown Apartments
Respondent determined that $ 50,000 out of the proceeds of the Parkstown Apartments sale was diverted from Cin-Lynn to petitioners in 1979. However, the actions taken by Mrs. Parks and Mr. Beard during 1979 do not support respondent's position. While there is no explanation for the apparently circuitous route by which the $ 48,905.53 check drawn on Lake Air National Bank and given by Mr. Dwyer to Mrs. Parks was transferred into an interest-bearing certificate of deposit in the amount of $ 50,000 issued by First National Bank of Waco, the end result was simply an investment of excess Cin-Lynn funds under Mrs. Parks' control. That is entirely consistent with other actions taken by Mrs. Parks and Mr. Beard during 1978 and 1979 with respect to Cin-Lynn's assets and properties. Use of the proceeds of this certificate of deposit in May 1980 to purchase silver through Monex in an account in petitioners' names may well have been a diversion of Cin-Lynn assets but the year 1980 is not before the Court. Through the end of 1979, there is no basis for concluding *330 that the investment of thesefunds in the certificate of deposit was an appropriation by petitioners of Cin-Lynn assets. We, therefore, hold for petitioners on this issue. Diversion from Commercial Account
In 1979, we have found, Mrs. Parks expended the sum of $ 1,823.83 in payment of doctor bills and other items personal to herself and her son. These funds belonged to Cin-Lynn; at least the Commercial Account has been explained as a mechanism for handling Cin-Lynn business. Hence, this use was a diversion, the amount should be taxable to Mrs. Parks and should have been included in petitioners' 1979 income tax return. We note also that funds from this account were loaned to Mrs. Parks' mother for her use but were reflected in an interest-free note. Respondent has not argued that interest should be imputed to Cin-Lynn and its tax years are not before us. While the loan may not have served any business purpose, we see no basis for increasing petitioners' income by this amount. Respondent has not raised either of these issues and we see no reason why we should do so. Redetermined Unreported Income
On the basis of the foregoing we hold that additional income is taxable to petitioners *331 for 1978in the amount of $ 43,500 and for 1979 in the amount of $ 13,015.77. Fraud Addition
Under section 6653(b) respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). Fraud is not to be imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969).However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra.The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); *332 Otsuki v. Commissioner, supra at 105-106. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States, 348 U.S. 121, 137 (1954); Otsuki v. Commissioner, supra.However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962). Fraud may not be found under "circumstances which at most create only suspicion." Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950);Katz v. Commissioner, 90 T.C. 1130, 1144 (1988). Other badges of fraud which may be taken into account include: the making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); the filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment *333 of assets, and failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. On this record, there is simply no basis for a finding that Mrs. Parks is liable for the fraud addition. She was forced into taking action on and with the advice of Mr. Beard under most difficult circumstances. The most one can conclude from this record is (i) that for a period of time $ 24,500 of Cin-Lynn's assets was set aside for the benefit of Mrs. Parks' son and ultimately and somewhat indirectly used to purchase Krugerrands; (ii) $ 1,823.83out of the Commercial Account was spent on personal items for Mrs. Parks and her son but respondent did not raise the issue; (iii) an aggregate of $ 63,015.77 of Cin-Lynn's funds was used to purchase gold and silver in 1979 and 1980; and (iv) attorneys fees aggregating $ 19,000 were paid in 1978 for Mr. Parks.
From this record we cannot determine specifically whether the facts pertaining to all of these items were fully disclosed by Mrs. Parks to the tax return preparer. The attorney fees were so disclosed. Moreover, Mrs. Parks was acting during 1978 and 1979 and thereafter on and with *334 the advice of Mr. Beard, except for the gold and silver investments. While there is no indication that she received tax advice from Mr. Beard or that he was knowledgeable in Federal tax, the $ 24,500 diversion was intended to be a protection against Mr. Parks' death while in prison. Mr. Beard in his capacity as attorney assisted. Later use of the $ 24,500 to purchase Krugerrands, at Mr. Parks' direction, but apparently before he became aware of the temporary diversion for Mrs. Parks' personal benefit, effected a return of the funds to the family unit although not to Cin-Lynn. We have concluded that use of Cin-Lynn moneys by Mrs. Parks to purchase gold and silver in the names of petitioners was not for the account of Cin-Lynn but those actions are not sufficient to show fraudulent intent on the part of either petitioner. There is simply an insufficient basis on this record for finding fraud on the part of Mrs. Parks or, except for collateral estoppel, against Mr. Parks. Respondent contends that Mr. Parks is collaterally estopped from denying that the underpayment of income tax for the years 1978 and 1979 is due to fraud. Collateral estoppel is based upon Mr. Parks' conviction of *335 income tax evasion for the years 1978 and 1979 in violation of section 7201. The law is clear that a criminal conviction based upon an indictment charging a wilful attempt to evade or defeat tax necessarily carries with it the ultimate factual determination that the underpayment was due to fraud. Amos v. Commissioner, 43 T.C. 50 (1964), affd 360 F.2d 358 (4th Cir. 1965).Thus, Mr. Parks is estopped from denying the existence of fraud for the years1978 and 1979. As to Mr. Parks, we hold for respondent. We further note that although petitioners filed joint returns, our finding of fraud against Mr. Parks, based solely upon collateral estoppel,does not warrant finding fraud against Mrs. Parks. Rodney v. Commissioner, 53 T.C. 287 (1960); Quantz v. Commissioner, T.C. Memo. 1990-39.
Accordingly the fraud addition is found against Mr. Parks but not against Mrs. Parks. Statute of Limitations
Respondent raises the 6-year statute of limitations under section 6501(e)(1)(A) as an alternative to fraud. Since we have found fraud against Mr. Parks under the doctrine of collateral estoppel, the statute is open as to him. Sec. 6501(c)(1). We consider this issue as to Mrs. Parks only. See Rodney v. Commissioner, 53 T.C. 287, 310-311 (1969). *336 The burden of proof is upon respondent. The parties have not stipulated as to the actual dates of filing of petitioners' 1978 and 1979 income tax returns. The returns themselves do not show filing dates but the signature appear to have been affixed prior to April 15 of the years 1979 and 1980. The preparer's signature on the 1978 returnis dated March 30, 1979, and on the 1979 return Mr. Parks' signature has the date "4-12-80" inserted next to it. Therefore, under section 6501(b)(2), both returns are deemed filed on April 15 (or the next business day) of each year. The 3-year statute would have expired on April 15 of the years 1982 and 1983. The statutory notice is dated November 23, 1983. Thus it was issued more than 3 years but less than 6 years after the filing date of both returns. As redetermined by us, the unreported income for 1978 is $ 43,500 and for 1979 is $ 13,015.77. The gross receipts reported on the returns for the years are respectively, $ 14,318.35 and $ 5,249.16. Twenty-five percent of each of these sums is respectively $ 3,709.90 and $ 1,312.29. Hence, the 6-year statute (section 6501(e)(1)) is applicable. The statutory notice is, therefore, timely as to *337 Mrs. Parks. Income Averaging
Petitioners have raised in their petition the issue of income averaging, but none of the parties has commented on the matter on brief. We, therefore, deem petitioners to have abandoned the issue. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In the stipulation and exhibits, this banking institution is also described as "Central Texas Savings and Loan" and as "Central Texas Savings Association." With one exception noted herein, transactions appear to have been with the Waco branch.↩
3. Mr. Beard gave a deposition which is in the record. However, as a result of injuries received in an accident, Mr. Beard's memory was impaired. Consequently, many details which only he could have supplied are unavailable.↩
4. We assume that the cashier's check was endorsed by Mrs. Parks to Mr. Beard. The copy of this exhibit is so illegible that we can only recognize the words "Peggy Parks" on the reverse side where an endorsement might be expected to have been made.↩